# LOGAN *v.* COUP

[No. 225, September Term, 1964.]

254

*Decided April 2, 1965.*

The cause was argued before PRESCOTT, C. J., and HORNEY, MARBURY, OPPENHEIMER and BARNES, JJ.

*Thomas F. Comber, 3rd,* with whom were *Wm. Pepper Constable* and *Kenneth A. Wilcox* on the brief, for appellant.

*William B. Calvert* for appellee.

PRESCOTT, C. J., delivered the opinion of the Court.

In February of 1964, Lee Roy Coup, Jr., filed a petition in the Circuit Court for Cecil County seeking to adopt his stepson, John E. Logan II. His wife, the child's natural mother, joined in the petition. The petition alleged that the child's father, John E. Logan, had orally consented to the adoption, and had abandoned his parental rights by failure to support, visit or inquire

about his son after July 5, 1963, when the child was removed, by his mother and her new husband, to Maryland from Syracuse, New York. John E. Logan filed an answer, denying any agreement on his part to the adoption, and alleging that the termination of support was by consent of the parties. The answer further stated that he was unable to visit the child because he had not been informed of the child's whereabouts. He also denied that the best interests of the child would be served by the adoption.

Following a hearing in the lower court on May 27, 1964, the Chancellor ruled that there was an oral agreement to consent to the adoption, which when coupled with a lack of support payments and visitation by appellant, amounted to a voluntary relinquishment of parental rights and an intention to assent to the adoption when the papers were prepared. The Chancellor further ruled that the child's best interests would be subserved by the adoption and signed a decree to that effect. From this decree, appellant has appealed.

The parents were married on August 1, 1959. The child over whose adoption the present dispute arose was born on October 1, 1961. After difficulties between the parents became crucial, appellant and his wife entered into a separation agreement on September 24, 1962, and were divorced *a vinculo matrimonii* in Alabama four days thereafter. The terms of the separation agreement were incorporated in the divorce decree.

The agreement provided that Mrs. Logan would receive custody of the child and appellant would pay $35.00 per week, an amount suggested by him, for the child's support. Logan was given the right to visit the child one afternoon each week, except Saturday and Sunday.

Pursuant to the agreement, appellant made support payments until July 3, 1963, after the remarriage of Mrs. Logan to appellee, Mr. Coup. Mrs. Coup testified that she informed her former husband that he would not be required to make future support payments, since he had agreed to the child's adoption by Mr. Coup, when she informed him of her intention to take the child to Maryland, where her new husband, a serviceman, was stationed. Appellant claimed, however, that the reason for

the cessation of support payments was his agreeing to allow the child to leave the State of New York.

During the nine-month period prior to Mrs. Coup's removal of the child to Maryland, appellant visited the child on several occasions. (Appellant testified that he visited the child ten or twelve times; Mrs. Coup stated that he made, at most, six visits.) Subsequent to Mr. & Mrs. Coup's moving to Maryland, appellant had no further contact with the child; however there was testimony that appellant had not been informed of Mr. & Mrs. Coup's Maryland address, had not been aware of any visits by them to Syracuse, and that a round-trip to visit the child in Maryland would have covered 600 miles.

Following Mrs. Coup's remarriage, appellant named his son beneficiary of a $10,000 life insurance policy, and continued to carry medical expense coverage on him.

Despite his earlier oral consent to the adoption, appellant contacted his former wife's attorney in November, 1963, and informed him that he would not then consent to it. A revocation or cancellation of a consent is explicitly permitted by the statute up to specified times. Section 74, *infra*. Appellant did agree, however, to permit the child's last name to be changed to "Coup," if that would alleviate embarrassment in the Coup family.

The appeal again brings into play the provisions of Code (1964 Supp.), Article 16, Section 74. It would serve no useful purpose to analyze and repeat the holdings in our previous decisions and to state, in detail, the conditions under which an adoption may be granted without the consent of a natural parent, for we have recently done so in quite a number of cases. Among these, see *Winter v. Director,* 217 Md. 391, *Walker v. Gardner,* 221 Md. 280, and *Shetler v. Fink,* 231 Md. 302. See also Strahorn, *Adoption in Maryland,* 7 Md. L. Rev. 275. In *Walker* and *Shetler,* Judges Hammond and Horney, for the Court, reviewed the prior rulings of the Court of Appeals and clearly enunciated the law upon the subject under consideration.

All of the decisions recognize that in adoption, as well as in custody proceedings, the welfare and best interests of the child are the primary considerations to be taken into account by the courts. However, adoption decrees bring to an end the legal re-

lationship of parent and child, which is not the case where custody, alone, is granted. The permanent severance of such a natural relationship, with its obvious, wide-spread results, has caused the courts to pause before sanctioning such extreme steps. Hence, the statement by Strahorn, *op. cit.,* "the Court of Appeals has indicated that it will not permit trial courts to decree adoptions over the expressed objection of the natural parent or parents, save in very strong cases."

Judge Horney, in *Shetler, supra,* stated well the rationale of our former holdings and pointed out some of the important factors to be considered thus:

> "While all the facts and circumstances in a case must be considered, the cases, which reached this Court on the merits of the question whether or not adoption should be granted, seem to indicate that willful abandonment, failure to contribute to support, neglect to see or visit, and unfitness of a natural parent, are some of the important factors to be considered in determining whether consent has been unjustifiably withheld; and that station in life and financial and religious considerations are of secondary importance. On the other hand, the natural rights of a natural parent that have not been lost or forfeited by his or her acts or conduct must be carefully weighed and considered in deciding the question."

As noted in the above quotation "wilful abandonment" is one of the prime factors to be considered in determining whether a consent is being "withheld contrary to the best interests of the child." In fact, the statute states that no consent is required from a parent who has lost his "parental rights through court action or voluntary relinquishment or abandonment." Section 74 (b). In the case at bar, the learned Chancellor did not find that there had been "a wilful abandonment" of the child by its father, but felt that the oral agreement of the father to consent to the adoption, coupled with the sparsity of the father's visits to see the child, and his cessation of support payments, signified "an intention to voluntarily relinquish his parental rights."

From a reading of our previous decisions and the authorities

elsewhere, it may be safely said that "abandonment," as used in said Section 74 (b), imports any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely. 2 Am. Jur. 2d, *Adoption*, § 32; Annotation 35 ALR 2d 662; 2 C.J.S., *Adoption of Children*, § 21 (d). Compare *Connelly v. Jones*, 165 Md. 544; *Lagumis v. Ex Parte Lagumis*, 186 Md. 97; *Shetler v. Fink, supra*, and the cases cited therein.

It is not necessary for us to determine at this time whether, as used in the statute, the terms "voluntary relinquishment or abandonment" were intended to be construed as synonymous. If they were not, the difference is certainly slight and difficult to point out with precision. The lexicographers all seem to name "relinquish" and "abandon" as synonyms, each for the other. The ones who make a fine, but rather slight, distinction between the proper use of the words state that "abandon" implies a final and complete relinquishment of something, as because of weariness, discouragement, etc., and "relinquish" signifies a giving up of something desirable, and connotes force of necessity or compulsion. If this rather thin and unsubstantial difference be recognized and the adjective "voluntary" is afforded its proper signification as modifying "relinquishment," it is plainly seen that the connotation of compulsion is removed, and the difference, if any, between "voluntary relinquishment" and "abandonment" is minuscule.

We proceed to a consideration of whether the facts in the case at bar disclose that the natural father had lost, at the time of the hearing below, his parental rights by reasons of "voluntary relinquishment or abandonment" thereof. We think not. It is true that he orally agreed to consent to the adoption in July, 1963. However, after having had an opportunity to consider the matter further and to arrive at the full legal import resulting from an adoption, he gave notice, in November, 1963, that he would not consent thereto. This revocation was specifically permitted by statute, and is quite generally allowed even in the absence of statutory authorization. His oral agreement of July, 1963, amounted to no more than a display of willingness on his part, at that time, to permit the adoption, which was explicitly

subject to cancellation by the statute up to the times named therein. After the remarriage of Mrs. Coup, Logan, who had not remarried, named his son as the beneficiary of a $10,000 life insurance policy, and he had continued to carry medical expense coverage for the son, as we noted above. After fully considering the matter, he decided to contest the adoption, and assigned as his main reason: "I do not want my boy to be adopted at this time because I love him and if I let them adopt him, I am no longer legally his father. I will have no rights to visit him whenever I want or when I am supposed to." This is one of the precise reasons why the courts consider the granting of adoption decrees over the objection of parents drastic and extreme action.

We now examine the complaints concerning the failure on the part of the father to visit the child and to continue the support payments as constituting, or being contributing factors in constituting, abandonment; and we shall consider them together. These are, of course, elements which may be weighed in determining whether or not there has been a loss of parental rights by "voluntary relinquishment or abandonment." However, as we view these claims in this case, they have little significance. First we shall discuss the alleged failure to visit the child. By the terms of the separation agreement, the father was permitted to visit the child but once a week, and then not on week-ends. The child was a tiny tot at the time of the divorce, some eleven months old. The father thinks he visited his son about 85% of the allotted times before the child was moved to Maryland; the mother thinks less. When the child's age is taken into consideration, with his consequent inability to play or converse with his father, no substantial significance can be given the father's failure to visit the son on all of the occasions allowed by the separation agreement. The father explains his failure to see the child after its removal to Maryland on the distance of travel (some 600 miles—round trip) and the expense involved. We think these reasons were sufficient to curtail the number of visits, but the total failure to visit the child after his coming to Maryland is somewhat short of what reasonably should be expected of an interested and devoted father. However, this alone, without more serious faults in the other claimed

deficiencies of the father, will not justify a finding of abandonment. In respect to the stopping of the support payments little need be said. All parties concur in the fact that they were stopped as a result of an agreement between them, although they differ on the terms of the agreement. Few cases take the position that failure to support a child, or allowing others to assume the burden, alone, is sufficient to constitute an abandonment. Annotation, 35 ALR 2d 662, 680. Compare *Connelly v. Jones, supra,* 165 Md. 544. In any event, future support for the child may be determined by the courts, if the parents are unable to agree thereon.

We conclude, therefore, that the record fails to support a finding that the appellant had lost his parental rights in the child by voluntary relinquishment or abandonment thereof.

This leaves for determination only the question, "What do the best interests and welfare of the child require of the Court?" Usually the answering of this question in adoption cases is a difficult and disagreeable task; however, under the circumstances here involved, we find the task neither difficult nor disagreeable. The Chancellor stated, "all of these people impress me favorably," they "[impress] me as being very fine people," "I can't find anything against any of them" and "I cannot find that the natural father is unfit." The record, we think, fully supports these observations and findings; and the parties are entitled to commendation for the praiseworthy candor and apparent truthfulness of their testimony (there can, of course, be slight discrepancies in testimony given, without disclosing dishonesty on the part of the witnesses).

The only advantage which would accrue to the infant in the event of adoption that the record discloses and the only one which could be advanced at argument was that the Coup family would be a "closer-knit" one. This, perhaps, could be said of any adoption case, where the adoptee is the offspring of one of the members of the prospective adoptive family. However, we have found no case, nor have we been referred to any, wherein this reason, standing by itself, has been considered sufficient to warrant the legal separation of parent and child; and, if we found such a case, we would decline to follow it. Cf. *Watson v. Dockett,* 229 Md. 63.

We see no reason to labor the question further. The facts and circumstances as developed in this case fall far short of a showing that the best interests and welfare of the child require an ordering of its adoption.

This ruling, of course, is not to be construed as the slightest reflection on either Mr. or Mrs. Coup. As stated above, the record shows them to be "fine people." However, in order to justify the drastic action of permanently severing the legal relationship of a fit and proper parent and his child, clear and sufficient legal reasons must be shown as to why such action is needed for the interests and welfare of the child. *Shetler v. Fink, supra.*

*Decree reversed, appellee to pay the costs.*