LIPPY *v.* BREIDENSTEIN, ET UX.
[No. 145, September Term, 1967.]

416

*Decided April 3, 1968.*

*Motion to recall mandate filed May 30, 1968; motion granted and findings amended June 10, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, BARNES, FINAN and SINGLEY, JJ.

*Norman F. Summers* for appellant.

*A. Raymond Bevans, Jr.,* for appellees.

HORNEY, J., delivered the opinion of the Court.

When the Circuit Court for Baltimore County (Jenifer and Haile, JJ.) decreed the seventh child of a natural father to be the legally adopted child of the foster parents, the natural father appealed to this Court. The natural father is Irvin R. Lippy. The foster parents are August Breidenstein and Virginia Breidenstein, his wife. And the adoptive child is Steven Lewis Lippy.

Within a sixteen-year period the natural father was married three times and begat nine children. All but two of them were born out of wedlock. Subsequently, the natural father consented to the adoption of the two children born in wedlock. The first

marriage ended in a divorce four and a half years after it began and the only child of that union was adopted by his stepfather after the remarriage of his mother. The second marriage did not take place until ten years after the first had been dissolved, but in the meantime six children (the sixth being Steven who was born on June 22, 1961) were born to the natural father and his paramour as a result of an illicit relationship that began while he was still married to his first wife. The second marriage, however, had the effect of legitimizing these children. Another child, born after the second marriage, was later adopted (with the consent of the mother as well as the father) under the auspices of the county welfare board. The second marriage was terminated by the granting of a divorce on the ground of adultery. The correspondent, whose relationship with Irvin Lippy began in 1960, became his third wife in May of 1964. Joan Lippy admitted that she gave birth to a son prior to her marriage to Irvin, of which he admittedly is the father.

On a petition charging the natural father with neglect, the county juvenile court, by its order of March 29, 1961, committed the children of the second marriage, other than Steven, to the county welfare agency for foster care placement and denied visitation rights to the father. On August 25 of the same year, the two-months old Steven, who was ill, was also found to be neglected and was committed to the welfare agency, which placed the child with the Breidensteins. After his hospitalization for surgery, from which he fully recovered, the child remained with the foster parents until he was returned, along with his five brothers and sisters, following the belated marriage of the natural parents. But a few months later all of the children were replaced in foster care. Steven was returned to the Breidensteins and is still there. He is now over six years old.

Since his marriage to the present wife, the natural father, due to the steadiness and firmness of his wife, appears to have acquired some stability.[1] He is employed as a freight conductor

---

1. In 1966 there was a marital flareup which was serious enough for the wife to consult caseworkers with the Welfare Board and the Lutheran Social Service and inform them that she was considering divorce. Since then, however, the husband and wife seem

by the Pennsylvania Railroad Company and earns approximately $12,000 a year. His wife is employed as a legal secretary and earns $100 a week. They own two properties—one their residence and the other an apartment house—subject to combined monthly mortgage payments of $195.

No contention has been made, as indeed none could be according to the record, that the Breidenstein home is not adequate in every respect. On the contrary it appears that the Breidensteins, who were unable to have children of their own, became as attached to Steven as they would a child of their own and provided for him accordingly. In addition to August and Virginia Breidenstein and Steven, the family consists of an adopted child and another foster child.

The natural father visited Steven at the home of the Breidensteins until Christmas of 1964 when a difficulty arose between the natural and foster parents. As a result, the present wife of the natural father, who had accompanied him on two visits, was denied further visitation privileges by virtue of a call from the foster mother to the welfare agency. During 1963 and 1964, the natural father, beside visiting Steven from time to time, sent him cards at Easter, at Christmas, and on his birthday. But he did not visit the child after 1964, allegedly because he was so advised by the welfare agency. Nor did he send him any cards or presents during 1965 and 1966.

At the time the Breidenstein home was approved as a foster care home in 1960, they signed an agreement in which they stipulated, among other things, that they would "take no action for adoption of any child placed with [them] by the agency" without its consent in writing. The Breidensteins violated the agreement when they filed the petition in this case. When, however, the child was returned to them in September of 1962, the natural mother had told the foster parents that she would consent to adoption. And at the adoption hearing, the foster mother testified that she would not have taken the child back had she not received that assurance.

---

to be getting along well together. They agreed at the adoption hearing that the difficulty had been temporary and that he is now assuming the responsibilities of a husband and father.

In making its decision, the lower court had before it a report from the county welfare board to the effect that the Lippys appeared to have achieved some stability; that they seemed to be sincere in their desire to have Steven with them; that the child knew the Breidensteins as his parents and not the Lippys; that removal from the foster parents would likely distress the child and that the board rather than make a recommendation would leave the decision to the court. In addition to the testimony of the parties, a circuit court probation officer (John B. Farrell) testified that in his opinion the best interests of the child would be served by granting the adoption. A caseworker for the welfare agency (Deborah Kormuth) testified that removal of the child from the home of the Breidensteins might permanently injure him and recommended that he be allowed to remain. On the other hand, another caseworker for the welfare agency (Madelyn Pease) testified that the child would be able to make the adjustment to the Lippy home as the other children had done and that the child should be returned to the Lippys.

The chancellors, after considering the better living conditions that had come about in the Lippy household as a result of the present wife assuming the role of making a suitable home for five stepchildren and her own child, were nevertheless apprehensive—particularly in view of the fact that the marriage had already gone through one serious challenge to its endurance—that the rearing of yet another stepchild might prove to be too much of a burden. The chancellors also thought, since the Breidensteins were the only parents the adoptive child had ever really known, that his removal from them would be a serious blow to his emotional well-being. And in weighing one factor against the other, they concluded that the consent of the natural father was withheld contrary to the best interests of the child.

Code (1966 Repl. Vol.), Article 16, § 74, provides in relevant part that "the court may grant a petition for adoption" without the consent of the natural parents[2] if, "after a hearing

---

2. Subsection (b) of § 74, in specifying the persons and agencies from whom consent to a proposed adoption must be obtained, includes—

"Both the natural parents, if married, if they are alive

the court finds that such consent * * * [is] withheld contrary to the best interests of the child."

The guiding principle in all child adoption and custody cases is that that action should be taken which subserves the best interests of the child. *Walker v. Gardner,* 221 Md. 280, 157 A. 2d 273 (1960). But there is a distinction between adoption and custody. What was said in that regard in *Walker v. Gardner, supra,* was recently quoted with approval in *Beltran v. Heim,* 248 Md. 397, 401, 236 A. 2d 723, 725 (1968) :

> "Unlike awards of custody * * * adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships have led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent."

The question as to whether consent has been withheld contrary to the best interests of the child necessarily depends on the facts and circumstances in each case. *Shetler v. Fink,* 231 Md. 302, 190 A. 2d 76 (1963). As we read it, the record does not support the finding that the consent of the natural father had been improperly withheld. Nor are we convinced, from what the record discloses, that the child would make a satisfactory adjustment in the Lippy household with brothers and sisters he had not been brought up with. Rather, we think that the concept of adoption in this case was premature and that, instead, the six-year old child should remain in the custody of the foster parents, who have cared for him from birth except for two brief intervals, subject to such change as subsequent circumstances may require. To this end, we shall reverse the adop-

---

and have not lost their parental rights through court action or voluntary relinquishment or abandonment."

Evidently, the welfare board had not been granted guardianship with the right to consent to adoption in this case.

tion decree and remand the case for the entry of an order award-
ing custody to the Breidensteins under such stipulations and
conditions, with regard to the duration of the custodianship, the
payment of support costs (if demanded) and the visitation rights
of those entitled thereto, as the court may deem proper after
further consideration of the matter. With further regard to the
period of custodianship, the court could award custody to the fos-
ter parents so long as the award is in the best interests of the
child, *In Re Harris,* 200 Md. 300, 89 A. 2d 615 (1952), and in
this connection the wish or desire of the child would be pertinent.
*Ross v. Pick,* 199 Md. 341, 86 A. 2d 463 (1952) ; *Shetler v.
Fink, supra,* at p. 308 of 231 Md.

> *Decree for adoption reversed and
> case remanded for entry of order
> awarding custody to foster par-
> ents; costs to be paid by appel-
> lant, Irvin R. Lippy.*