# JAMES F. SCHWARTZ ET UX. v. FRANCES HUDGINS

[No. 647, September Term, 1970.]

*Decided June 28, 1971.*

The cause was argued before ORTH, THOMPSON and CARTER, JJ.

*Norman F. Summers,* with whom was *Julian S. Brewer, Jr.,* on the brief, for appellants.

No brief filed on behalf of appellee.

ORTH, J., delivered the opinion of the Court.

By its decree of 16 November 1970 the Circuit Court for Baltimore County in Equity denied the adoption of Angela Marie Houser by James F. Schwartz and Patricia Ann Schwartz, his wife. It awarded the guardianship and custody of the child to Mr. and Mrs. Schwartz with a right of visitation in the natural mother, Frances Hudgins, formerly Frances Houser, all subject to its further order. Mr. and Mrs. Schwartz appealed.[1]

Angela's natural father, Frank Houser, consented to the adoption. Her natural mother refused to give her consent. In reaching his conclusion the chancellor made factual findings which we accept. Maryland Rule 1086; *Sullivan v. Auslaender,* 12 Md. App. 1 (1971). He set them out in a memorandum opinion. "The natural mother of the child proposed for adoption had three children: BERNARD ANTHONY HOUSER, born November 21, 1955; MARY TERESA HOUSER, born July 26, 1957,

---

1. There is no brief or appearance for Frances Hudgins, the appellee.

and ANGELA MARIE HOUSER, born December 30, 1964. In February, 1965, when Angela was two months old, the mother left the home where the children and her husband resided and moved to an address on Calvert Street in Baltimore City. She made no effort to contact the children, husband, or any public authority for about two months. She explained her actions as caused by a sense of hopelessness and desperation arising from her husband's indolence and intoxication. These events triggered a Juvenile Court hearing, attended by the mother, at which the three children were found to be neglected and dependent and were committed to the Baltimore County Welfare Board for foster placement on April 30, 1965. JAMES F. SCHWARTZ and PATRICIA ANN SCHWARTZ, his wife, were chosen as foster parents of all three children shortly thereafter, when Angela was but a few months of age. At that time the Schwartzes were childless. Three children subsequently were born to the couple, namely: JAMES JOHN SCHWARTZ, age 4; AMY LOUISE SCHWARTZ, age 2, and GINA ROSE SCHWARTZ, age 7 months, who reside in the home with Angela. Mr. Schwartz is an Officer of the Baltimore County Police Bureau. Mrs. Schwartz is not employed, except as housewife and mother. Both bear the highest reputation. Their present home is a four bedroom, detached dwelling on a lot 75 feet by 105 feet. It was manifest that both have the same deep affection for Angela as for their own children. The interrelationship of these children was described as extremely close. Angela was described as a happy, well adjusted child. The Schwartzes have resided in their present home for about one year. In the first year, visitations by the natural mother to her children occurred monthly with reasonable regularity. The visits decreased thereafter and by August, 1968 had become very infrequent. At that time her son, Bernard, left the Schwartz household to live with his mother and her present husband, FREDERICK ALLAN HUDGINS. There were no visitations by the natural mother thereafter. She never thereafter sent Angela a

letter or greeting card on holidays or birthdays. Sometime prior to the time that Bernard returned to the home of his mother, the other daughter, MARY TERESA HOUSER, had been taken from the Schwartz home and placed in other foster care. The reason for that course is in dispute—Mrs. Hudgins suggests that the child was unhappy because of unfair treatment by the Schwartz family; the Schwartzes contend that the admitted difficulty with Mary Teresa within the household was caused by a feeling by the child that she had been rejected by her mother. Mary Teresa now resides with her mother. She did not testify. The evidence is strong and fully believed by the Court, that the natural mother never, by word or deed, expressed or evidenced love and affection for Angela. Once, in the course of a long delayed visitation, Angela, in the presence of her natural mother, inquired 'who is this lady?' The mother did not even respond. At or about the time when the mother's visitations had ceased altogether, when Angela was about three years old, the child was told by Mrs. Schwartz that she was not the real mother. This apparently caused the child to become quite emotionally upset, for which medical attention was required. Thereafter, no comment about Angela's true parentage ever was made by the Schwartzes. She was known within the family and the community as 'Angela Schwartz'. When Mrs. Hudgins learned [apparently from her son, Bernard] that Angela was being called a 'Schwartz' she protested to a representative of the Welfare Department. Discussions took place between the Schwartzes and the Welfare Department on the subject. It was agreed that meaningful visitations by the mother to the child were necessary and desirable if the child were to achieve an appropriate parent-child relationship. The visitations never took place. The relationship between the natural mother and Angela appears to have been different than with her son, Bernard. On her infrequent visitations her interest and affection seem to have been directed exclusively to the son — the daughter was ignored. The evidence compels the conclusion that

the child Angela regards herself and is regarded by the Schwartz family and the community generally as a child of that household. This is directly and exclusively the product of the natural mother's failure ever to indicate affection for the child; the gross infrequency of her visitations in the early years; the seeming disinterest in the child during these infrequent visitations, and the complete absence of any contact either in person or by card or letter within the past two years.

"The evidence shows abundant opportunity for the mother to maintain frequent and meaningful visitations with the child, particularly after Mrs. Hudgins' marriage to her present husband on January 29, 1967. She is employed as a nurses aide at the Mercy Hospital at a net bi-monthly wage of $164.00. Her husband was said to have a take-home wage of $125.00 weekly, with gross wages of $9,500.00 in 1969. She works five days a week, with regular work hours of 7:30 A.M. to 4:00 P.M. Her non-work days are variable, but occur chiefly in mid-week. Her husband's hours of employment generally extend from 7:00 A.M. to 3:00 or 4:00 P.M., with most Saturdays and Sundays off. She has two weeks vacation annually; her husband five weeks. It is true that the former residence of the Schwartzes was somewhat removed from public transportation — about five or six blocks away in hilly terrain — but the present home is only one block from such transportation. It is simply beyond belief that the natural mother was barred, either by financial restraints or by travel difficulties from visitations with her child. Still, the natural mother has stated an ultimate desire to have Angela with her at some indeterminate future time. Mrs. Willin, of the Probation Department of Baltimore County, testified that during her interview Mrs. Hudgins presented no plan for her daughter to return to the home — that she just didn't know, she couldn't tell when such return would occur. Mrs. Willin also testified that the natural mother showed no evidence of love for the child in the course of her interviews. The natural mother testified that she believed

that Angela would adjust toward her because the child knew that Mary and Bernard were her sister and brother. She stated that it was her purpose from the very beginning to have all of her children return and that this purpose has been achieved as to Mary and Bernard. She hoped that Angela will return after her husband 'has more time to adjust.' The natural mother's explanation of her admitted failure to maintain any contact with Angela in the past two years, or to explain the infrequent contacts prior thereto is most unsatisfactory. Her explanation that cards were not sent because of fear that they may not be delivered by the Schwartzes is equally unimpressive. The testimony in this case persuades the Court that the removal of this child from the household of the Schwartzes at this time would cause at least temporary harm to the child. This is solely a circumstance caused by the mother's failures as a parent. She has not evidenced love and affection for the child."

The primary consideration of transcendent importance in child adoption cases, as in child custody cases, is firmly established — that action should be taken which subserves the best interests of the child. *Lippy v. Breidenstein,* 249 Md. 415, 420. Although in reviewing such cases we accept the factual findings of the chancellor if not clearly wrong, we exercise our best judgment in determining whether the conclusion the chancellor reached on those facts was the best one for the welfare, benefit and interests of the child. *Sullivan v. Auslaender, supra.* In so doing in adoption cases, however, we recognize that they are to be distinguished from custody cases. The distinction was pointed out in *Walker v. Gardner,* 221 Md. 280, 284, quoted with approval in *Lippy* at 420, in *Beltran v. Heim,* 248 Md. 397, 401 and in *Goodyear v. Cecil County Department of Social Services,* 11 Md. App. 280, 284:

"Unlike awards of custody, (* * *), adoption decrees cut the child off from the natural parent, who is made a legal stranger to his off-

spring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent."

The Court of Appeals has indicated that it will not permit trial courts to decree adoption over the expressed objection of the natural parent save "in very strong cases." [2] The Legislature has provided for consent to be obtained in certain circumstances to any proposed adoption. Applicable here is the requirement that such consent shall be obtained from one natural parent, if the other has lost his parental rights through voluntary relinquishment. Code, Art. 16, § 74 (c). But since the amendment of the statute by chapter 622 of the Laws of 1955 there is an express exception regarding the requirements of consent: "However, the court may grant a petition for adoption without any of the consents hereinafter specified,[3] if, after a hearing the court finds that such consent or consents are withheld contrary to the best interests of the child." [4] See Rule D 73 based on the statute as amended. Even before this provision was added by amendment the Court of Appeals did not read into the statute "an absolute, arbitrary veto on the part of the parent." *Lagumis v. Ex Parte Lagumis,* 186 Md. 97, 106. And see *Alston v. Thomas,* 161 Md. 617. The test as to what is to the best interests of the child necessarily depends on the facts and circumstances in each case. In *Shetler v. Fink,* 231 Md. 302 the Court reviewed cases decided by it before and after the amendment regarding consent. It said, at 308:

---

2. Strahorn, *Adoption in Maryland,* 7 Md.L.Rev. 275, 295.
3. They are specified in Art. 16, § 74, subsections (a) to (h) both inclusive.
4. The original adoptive statute required notice to a parent or guardian but not their consent to the adoption.

"While all the facts and circumstances in a case must be considered, the cases, which reached this Court on the merits of the question whether or not adoption should be granted, seem to indicate that willful abandonment, failure to contribute to support, neglect to see or visit, and unfitness of a natural parent, are some of the important factors to be considered in determining whether consent has been injustifiably withheld; and the station in life and financial and religious considerations are of secondary importance. On the other hand, the natural rights of a natural parent that have not been lost or forfeited by his or her acts of conduct must be carefully weighed and considered in deciding the question."

In the case before us the chancellor never decided whether the natural mother withheld her consent to the adoption contrary to the best interests of the child. He said: "There is some doubt whether her refusal to consent to adoption in this case is caused by a real interest in the welfare of her daughter, or whether it is withheld simply because she considers that such a course would be a brand of infamy upon her." He then denied the adoption because the evidence fell short of establishing that the mother had abandoned the child "under the stringent rules laid down in *Lippy v. Breidenstein*, 249 Md. 415 and *Logan v. Coup*, 238 Md. 253." Of course, had the chancellor found that the mother had abandoned the child, her consent would not be required under the terms of the statute because she would have lost her parental rights through the abandonment. We do not share the chancellor's view of *Lippy* and *Logan*. In *Lippy* the Court of Appeals, exercising its independent judgment on the facts, found, contrary to the finding of the lower court, that the consent of the natural father was not withheld contrary to the best interests of the child. In so concluding the Court of Appeals noted that there was

a report from the county welfare board to the effect that the natural parents appeared to have achieved some stability; that they seemed to be sincere in their desire to have the child with them; that the board rather than make a recommendation would leave the decision to the court. A circuit court probation officer testified it was his opinion that the best interests of the child would be served by granting the adoption. A caseworker for the welfare agency thought the removal of the child from the foster parents might permanently injure him and recommended he be allowed to remain. Another caseworker, however, testified the child would be able to make the adjustment to the home of the natural parents and should be returned to them.[5] In *Logan* the lower court granted the petition for adoption and the Court of Appeals reversed because "clear and sufficient legal reasons" were not shown that the adoption was needed for the interests and welfare of the child. In so deciding the Court first found that the natural father, who withdrew his consent to the adoption,[6] had not lost his parental rights in the child by voluntary relinquishment or abandonment thereof. It then determined that the best interest and welfare of the child did not require the adoption, a determination which it had no difficulty in reaching because the facts and circumstances fell "far short" of so showing. It pointed out that the chancellor stated, "all these people impress me favorably," they "[impress] me as being very fine people." "I can't find anything against any of them" and "I cannot find that the natural father is unfit." The record fully supported those observations and findings. In fact the only advantage that the record disclosed for the adoption was that the family of the foster parents would be a "closer-knit" one, and it found

---

5. In applying for the adoption the foster parents violated a written agreement made with the welfare agency that they would take no action for adoption of any child placed with them by the agency without its consent in writing.

6. Consent obtained under Art. 16, § 74 may, by its provisions, be revoked and cancelled at any time before the final decree with certain exceptions designated.

no case where that reason, standing by itself, had been considered sufficient, 238 Md. at 260-261.

We think it patent that it does not necessarily follow that because a natural parent has not abandoned a child, it must be found that he is not withholding consent contrary to the child's best interests. Thus accepting the view of the chancellor here that Mrs. Hudgins' actions were not sufficient to establish that she voluntarily relinquished or abandoned Angela within the meaning of those terms as discussed in *Logan* at 257-259, does not preclude a determination that she withheld consent to the adoption contrary to Angela's best interests. On the contrary, on the facts found by the chancellor, we can only conclude that Mrs. Hudgins did withhold consent to Angela's adoption by Mr. and Mrs. Schwartz contrary to the best interests of the child. We are not able to find here any of the considerations which led the Court in *Lippy* and *Logan* to feel that the adoption was premature. The chancellor found that Mrs. Hudgins never, by word or deed, expressed or evidenced any love and affection for Angela. She ceased visiting the child despite discussions with the welfare department at which it was agreed that "meaningful visitations" were necessary and desirable if the child were to achieve an appropriate parent-child relationship. There was over the past two years a complete absence of any contact either in person or by card or letter between Mrs. Hudgins and Angela, although the chancellor found "abundant opportunity" for the natural mother to maintain frequent and meaningful visitations. He found her reasons for lack of contact most unsatisfactory and unimpressive. Although Mrs. Hudgins stated an ultimate desire to have Angela with her it was to be at some indeterminate future time. She presented no plan or real desire for Angela to return to her, showing no evidence of love for her whatsoever. She told the welfare department that it would be impossible for her and her husband to take Angela as they do not have the room or the money. She was willing for the Schwartzes to keep her until she was ready for her but she did

not know when this would be. Nor did it seem that she could adequately look after the young child; the two children with her look after themselves while she works. On the other hand it is apparent from the chancellor's comments in the memorandum opinion that he felt that the foster parents were eminently fit persons to care for Angela in happy and pleasant surroundings. He found manifest that they had the same deep affection for her as for their own children and the interrelationship of the children was extremely close. Angela was happy and well adjusted. She regarded herself and was regarded by the Schwartz family and the community generally as a child of that household.

We believe that this is a very strong case in which adoption should be permitted over the expressed objection of the one natural parent who refused to give consent. Although the case before us is resolved on its own facts and circumstances, on the factual findings of the chancellor we find it stronger than *Walker v. Gardner, supra, Alston v. Thomas, supra,* and *King v. Shandrowski,* 218 Md. 38, in which there was "more than a hint that the best interests of the child might be found by the trial court on remand to lie in adoption by the custodians of the child, despite the objections of both natural parents." *Walker* at 284-285. Compare *Goodyear v. Cecil County Department of Social Services, supra,* in which, unlike the instant case, we did not have a situation where the child to be adopted had been in the custody of individuals seeking the adoption or exposed to them in a manner which would engender feelings of love, affection and emotional attachment toward them. Nor did we know, in *Goodyear,* as we here know, the type of parents, environment or surroundings which would be provided in the adoptive home. 11 Md. App. at 286.

Applying the facts found by the chancellor to the important factors to be considered, it is our best judgment that the adoption sought should be decreed as best for the welfare, benefit and interests of the child. We re-

mand the case for the passage of a decree in accordance therewith.[7]

> *Decree reversed; case remanded for passage of a decree as prayed in petition of appellants; costs to be paid by appellee.*

---

7. We note that we do not remand without affirming or reversing as was done in *King v. Shandrowski, supra,* because we do not feel that further proceedings are required below. Unlike *King* the facts found by the chancellor here, as supported by the evidence, were ample for us, in the exercise of our best judgment, to conclude with no difficulty that the adoption should be decreed as best for the welfare, benefit and interests of the child.