WANDA F. BRENDOFF, formerly Wanda F.
Schlichting *v.* FRANK
TITUS et ux.

[No. 807, September Term, 1973.]

*Decided August 9, 1974.*

The cause was argued before MENCHINE, MOORE and LOWE, JJ.

*Arthur L. Rhodes, Jr.,* for appellant.

*John E. Sibrea* for appellees.

MOORE, J., delivered the opinion of the Court.

The paternal grandparents of a little girl born out of wedlock on October 12, 1971, were awarded a decree of adoption over the objection of the natural mother. After a full hearing in open court, the chancellor delivered an oral opinion from the bench, stating in part:

> "This is not a question of taking a child from the home of the mother and father and giving it to someone else, but it is merely the question of a child born out of wedlock in which the father of the child consents to his parents adopting her and the mother of the child, offering a home with a new husband, objects to it.

> \* \* \*

> "I take into account there may be other contributing causes, but when we compare her life as disclosed here, taking, as I say, the undisputed facts and her past history, and compare that with the home the Tituses offer and the history of that family and its unquestioned stability and suitability for raising a child, I do not feel that I have any choice but to grant the petition to adopt, keeping in mind that the paramount consideration of the Court is the welfare of the child. That welfare can only be served by putting the child in a stable home where she will have an opportunity to receive the benefits of that stability."

Code (1973 Repl. Vol.), Art. 16, § 74 (d) requires the consent of the *mother* of a child born out of wedlock, if

living, and if she has not "lost her parental rights through court action or voluntary relinquishment or abandonment." With respect to consents generally, § 74 provides, as does Maryland Rule D73, that the Court may grant a petition for adoption if it finds after hearing that the consent has been withheld "contrary to the best interests of the child."

The chancellor did not find, in our reading, that the natural mother "abandoned" the child within the meaning of the Code nor did he expressly find that the mother withheld her consent contrary to the child's best interests. We have reviewed carefully the testimony of all witnesses at the hearing below and the chancellor's findings and conclusions. While we do not hold that he was clearly erroneous in his factual findings, we do conclude that the evidence was not sufficient to support the statutory requirements and that the determination made was not in the child's best interests. *Schwartz v. Hudgins*, 12 Md. App. 419, 278 A. 2d 652 (1971).

The petitioning grandparents, Frank and Katherine Titus, were 50 and 52, respectively, at the time of the hearing on July 9, 1973 and the parents of five sons whose ages were 27, 26, 24, 15 and 12. The second son, Raymond Titus, is the father of the adoptee, Deborah Kay Titus, who will be three years old on October 12, 1974. They were granted the guardianship, care and custody of Deborah by Order of the Circuit Court No. 2 of Baltimore City on May 23, 1972. Appellant's brief concedes that the child is well cared for and that the grandparents' home "is a wholesome and proper one for her upbringing."

Mr. Titus is self-employed in the home improvement business. He allowed his son Raymond and Wanda Brendoff (formerly Wanda Schlichting) to live together for a time in the Titus home, Wanda being separated from her husband. He hoped, he said, that they would ultimately marry and lead a "decent life." Later, he put them out when both of them quit their jobs. Wanda first went to an apartment and then resided at the home of her mother, both before and after the birth of Deborah.

The natural mother, age 24 at the time of the hearing, was first married at the age of 14 to James Schlichting, by whom

she had four children, three of whom were residing with the paternal grandmother. The fourth child was given up for adoption by Wanda at the hospital where the child was born, pursuant to arrangements made prior to the birth and with Mr. Schlichting's consent. She was divorced from Schlichting on June 22, 1973 and the next day was married to Paul Brendoff, also recently divorced, but with whom she had been living for about fifteen months prior to their marriage. Wanda was several months pregnant with Paul's child at the time of the hearing. Mr. Brendoff testified that he was willing to adopt Deborah. He also wanted Wanda to regain custody of her three other children. He works steadily as a truck driver, earning twelve to eighteen thousand dollars per year. His former wife divorced him on grounds of adultery and he is required to pay child support of $51.50 per week, and admitted that he was in arrears.

The care of Deborah by the grandparents began on November 12, 1971 when the maternal grandmother, Anne Louise Garrett (formerly Harris), informed the Tituses that the child was ill and in need of food. They brought her to the doctor and then to their home. She was there about one week, Mrs. Titus testified, "when Wanda came and got her." Several weeks later, "when Wanda was put out of where she was living," she brought her back again and they had her until after New Year's. — approximately two weeks. On February 3, 1972 Wanda went to the Titus home and, according to Mrs. Titus:

> "The baby was sick at the time, which Wanda knew, and she got my son and I on the pretense to take her to get the baby's picture taken *and when she did she took the baby from us.* (Emphasis added.)

On or about February 26, 1972, the Tituses again took Deborah and brought her to the hospital. The doctor diagnosed the child as asthmatic and prescribed medication. Mr. and Mrs. Titus obtained the prescriptions and again took the baby home. It is their version of the facts that Wanda had left Deborah with an elderly woman in an apartment

downstairs; that they had gone to the apartment with Wanda's mother and the baby sitter was not present. Mr. Titus testified that he called the police and was informed that he had no right to take the child but that the baby sitter called them later and requested that they come and take Deborah — and they did.

Wanda testified that she and girl friend, Celeste, had gone to a party on a boat in Baltimore Harbor about 3 p.m. Celeste's baby and Deborah were left with the baby sitter who was not elderly but about 35. She was told that the apartment shared by Celeste and Wanda was open "if she needed anything in the way of food or clothes." Then, according to Wanda:

> "When I came back home the next morning — it was overnight. That's how the party went. Anyway about, I'd say, 4:00 a.m. in the morning she said the Tituses came over and took the baby away from her, actually pulled her out of her arms. She said the grandmother and the father did it. I don't know how true it was, but I took it for granted that's what it was. I called the Tituses and they said they wouldn't bring her back. *I demanded them to, but they said no. I called the Court and they said nothing could be done until morning, whatever time the Court opened up.* Then *I could take out the warrant and I did.*" (Emphasis added.)

The warrant charged kidnapping. Mr. and Mrs. Titus were apprehended, handcuffed and jailed overnight. The court ordered them to return the child and there were no further proceedings. After this occurrence, Wanda would take Deborah to the Titus home for weekend visitations. Apparently as a direct consequence of their arrest, however, the grandparents thereafter petitioned the court for custody, and after investigation and a court hearing at which Wanda did not appear, the petition was granted in May, 1973. According to Wanda, she did not appear because she did not understand a "show cause order" and had been advised by a deputy sheriff whom she knew that so long as she had not

been served with a summons, she did not have to "show up in court . . . so I disregarded the papers."

Under questioning by the court, she stated that the papers had been served on February 12, 1972. When asked if she had read them, she told the court:

> "I sit down, but as far as understanding, you know, I just disregarded the whole thing more or less. I just said no one is going to take my baby and that was that. I didn't know it was that easy for somebody else to get custody of your own child, not unless you were really in fault."

She first learned of the custody decree when she left Deborah with the grandparents for a weekend and they refused to permit Wanda to take her back. Wanda testified that she immediately went to see a lawyer "to regain custody of my daughter."

A representative of the Adoption and Custody Unit of the Department of Juvenile Services who conducted the guardianship and adoption investigations and was called as a witness for Mr. and Mrs. Titus in the adoption proceeding, testified on cross-examination that Wanda "wanted the child back and was opposing the guardianship." Wanda herself on cross-examination said that, when told by the investigator that Mr. and Mrs. Titus wanted to get custody of Deborah: "I told her they never would." Wanda's mother testified that, after the guardianship Order, Wanda visited the baby "just about every week." She sometimes brought Mr. Brendoff with her and, on occasion, her other children.

This is not, of course, a custody case. There is a profound distinction between custody and adoption. As we noted in *Schwartz, supra*, this distinction was clearly enunciated by Judge Hammond (now retired Chief Judge) in *Walker v. Gardner*, 221 Md. 280, 157 A. 2d 273 (1960) at p. 284.

> "*Unlike awards of custody, . . . adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring.* The consequences of this drastic and permanent

severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. *The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent.*" (Emphasis added.)

Judge Hammond's statement was quoted with approval in *Lippy v. Breidenstein*, 249 Md. 415, 240 A. 2d 251 (1968); *Beltran v. Heim*, 248 Md. 397, 401, 236 A. 2d 723, 725 (1968) and *Goodyear v. Cecil County Department of Social Services*, 11 Md. App. 280, 273 A. 2d 644 (1971) (reversed on other grounds, 263 Md. 611 (1971)).

The first issue which the General Assembly has required Courts to consider is whether or not the non-consenting natural mother of an illegitimate child has "lost her parental rights through court action or voluntary relinquishment or abandonment." In the present case, the custody proceeding initiated by the grandparents is obviously not the "court action" contemplated. The immediate question, then, is whether Wanda abandoned or voluntarily relinquished her child.

As Chief Judge Prescott observed in *Logan v. Coup*, 238 Md. 253, 208 A. 2d 694 (1965), the distinction between voluntary relinquishment and abandonment is "miniscule." He defined "abandonment" in the following terms (p. 257):

"From a reading of our previous decisions and the authorities elsewhere, it may be safely said that 'abandonment,' as used in said Section 74 (b), imports any wilful and intentional conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child, and to renounce and forsake the child entirely. 2 Am. Jur. 2d, *Adoption*, § 32; Annotation 35 A.L.R.2d 662; 2 C.J.S., *Adoption of Children*, § 21 (d). Compare *Connelly v. Jones*, 165 Md. 544; *Lagumis v. Ex Parte Lagumis*,

186 Md. 97; *Shetler v. Fink, supra,* and the cases cited therein.

We find here a total absence of evidence to show conduct which comports with this definition. In determining abandonment *vel non* the test is not the parent's fitness to have custody. Wanda has not been the ideal mother. The record is convincing, however, that she was obdurate in her determination to keep her child, not to forsake it — even though she did neglect it. Before there was any intimation of a custody proceeding by the grandparents, she resorted to a ruse to get the child away from Mrs. Titus; her action in obtaining a warrant charging the grandparents with kidnapping was ill-advised and unfortunate but patently was fostered by concern for her own rights to her child and not petulance or spite; her explanation for not answering the show cause order in the guardianship case is reasonable and her action in engaging legal counsel as soon as it became apparent to her that she had lost custody of Deborah hardly indicates a purpose to "relinquish all parental claims to the child;" the court investigator's testimony clearly shows the natural mother's opposition to and defiance of the grandparents' desires to obtain custody; and the mother's regular visits to the child after the guardianship Order demonstrate a settled purpose to assert her parenthood and to avoid becoming a stranger to her offspring. We find singularly appropriate the comment of Judge Horney in *Beltran v. Heim, supra.*

"... [W]hile the irresponsibility and marital indiscretions of the [mother] would be very relevant on the issue of custody, such faults without abandonment are not enough to justify severance of the parental relationship." (248 Md. at 402).

The question remains, under the Code and Rule D73 — was the mother's consent withheld contrary to the best interests of the child? In *Shetler v. Fink,* 231 Md. 302, 190 A. 2d 76 (1963), Judge Horney again speaking for the Court, made it plain that all of the facts and circumstances of the

particular case must be considered in determining whether consent has been unjustifiably withheld and that the natural rights of a natural parent, which have not been lost or forfeited, must be carefully weighed in deciding the question. Factors to be considered within these parameters, the Court held, are failure to contribute to support, neglect to see or visit the offspring and unfitness.

In a later case, here very relevant, and in another opinion by Judge Horney, the Court reversed a decree of adoption where the non-consenting father had been married three times in a sixteen-year period and "begat" nine children, all but two of whom were born out of wedlock — and had consented to the adoption of the two legitimate children. *Lippy v. Breidenstein, supra.* The opinion in *Lippy* also disclosed that at one time six of the children were in foster homes but after the third marriage, a marked improvement occurred. The natural father "due to the steadiness and firmness of his wife, appears to have acquired some stability." In language strikingly apposite to the instant case, the Court held (p. 420):

> "Rather, we think that the concept of adoption in this case was *premature* and that, instead, the six-year old child should remain in the custody of the foster parents, who have cared for him from birth except for two brief intervals, subject to such change as subsequent circumstances may require." (Emphasis added.) [1]

In our view of the case, the evidence tends to show that Wanda's determination not to consent to the adoption of her baby daughter was born of a genuine concern that by consenting she would sever permanently the natural and legal rights and obligations binding parent and child. Because we believe that Wanda did not lose or forfeit her parental rights, and did not unjustifiably withhold her consent contrary to Deborah's best interests, we shall

---

[1]. The petition for adoption in this case was filed on January 18, 1973 when Deborah Kay Titus was fifteen and one-half months.

reverse the order of the chancellor granting the adoption. The child of course remains under the guardianship of Mr. and Mrs. Titus.

*Decree of adoption reversed; costs to be paid by appellees.*