## GAIL LLOYD *v.* JOHN G. SCHUTES ET UX.

[No. 422, September Term, 1974.]

*Decided February 14, 1975.*

The cause was argued before ORTH, C. J., and THOMPSON and MENCHINE, JJ.

*Melvin G. Bergman,* with whom were *Borelli, Daniello & Bergman* on the brief, for appellant.

*Gary R. Alexander,* with whom were *Giordano, Alexander, Haas, Mahoney & Bush* on the brief, for appellees.

THOMPSON, J., delivered the opinion of the Court.

This is an appeal by Gail Miller Lloyd from a decree of the Circuit Court for Prince George's County ordering that her infant child, Sandra, born June 19, 1969, be the adopted child of Mr. and Mrs. John G. Schutes, the appellees.

Sandra was born to the appellant and Dale Lloyd, her husband, on June 19, 1969, ten days after they were married and while they were both patients at Spring Grove State Hospital. Both were subsequently released from Spring Grove and Sandra lived with them for approximately one year. In June 1970, as a result of serious financial difficulties and a steadily deteriorating relationship between the parents, Sandra's paternal grandparents, Arthur and Lillian Lloyd, were asked to take custody of her by the appellant and Dale. In July of 1970 an order was signed giving temporary custody of Sandra to the elder Lloyds. That order also provided that within five months the child should be placed in a foster home. In accordance with that order, the elder Lloyds gave Sandra to a member of the Prince George's County Foster Care Unit in December of 1970. Instead of being put in foster care, however, the child was given back to the appellant, where she stayed until January 29, 1971 when Dale Lloyd removed her and returned her to the elder Lloyds. Several days later Sandra was placed in foster care. She lived with two foster families until October 1971 when the elder Lloyds again applied for and were granted custody. The appellant did not attend this custody hearing although she admitted having been notified. In December 1972, the elder Lloyds, as a result of failing health, felt they could no longer look after Sandra. The grandparents therefore gave Sandra to the appellees who were anxious to adopt a daughter and who knew the Lloyds through church activities.[1] Sandra has lived with the appellees since that time.

---

1. This transfer was in violation of Md. Code, Art. 88A, § 20 if adoption was intended by the parties at the moment of transfer. We do not pass upon the question because on this record the illegality, if any, would have no effect on the best interests of the child.

The instant case arose on June 21, 1973, when the appellees filed a "Petition for Adoption and Change of Name" with an alternative prayer for custody of Sandra. The appellant opposed the adoption and requested that custody be returned to her.[2] Dale Lloyd, the natural father, consented to the adoption.

He, Dale Lloyd, testified that on January 29, 1971, he went to the appellant's rooming house and found Sandra in the following condition:

"Sandra then proceeded to follow her into the main hallway dressed in what appeared to be, to me, either a T-shirt or a nightgown made of cotton; it was filthy, this I could see right away. She had the remains of a chicken bone in her hand."

\* \* \*

"I saw Gail, I saw the baby, my comments were, 'Jesus Christ, what the hell is going on here? ' And at this time Gail realized exactly what I was going to do. She bent down, she grabbed the baby and picked her up. I then grabbed the baby and pushed Gail away with my hand. When she was free of me and the baby I turned and started towards the door. I looked back and Robert, or Bob, came, was already in the hallway and started towards me. I then ran out the door, down the sidewalk into the cab , and we took off in a great hurry."

\* \* \*

"I found that Sandra was not properly clothed for the evening, you know, for that time; it was one of the coldest days we had that year. And she stunk, she reeked of urine and feces. I later found that the feces was dried in her diaper, in her pamper — it wasn't a diaper, it was a pamper. And we then left the house on Oglethorpe, rounded the corner by the

---

2. A divorce action between the appellant and Dale Lloyd was consolidated with the adoption proceeding. A divorce on the grounds of voluntary separation was granted. That decision has not been appealed.

railroad tracks and we came in by a little liquor store which is known as Dumm's Corner, where the cab driver had to stop the cab and get out to keep from vomiting. He was unsuccessful, he threw up all over the front of his cab from the smell. I wrapped the baby in my coat and left the window partially cracked. The cab driver got back in the cab and we left for Oxon Hill."

Arthur Lloyd, Dale's father, testified as to Sandra's condition at the time as follows:

"She was filthy. She had a T-shirt, and it was also filthy. She had a diaper on, whether it was a Pamper or diaper I don't recall, but it was — had dried feces in it. We gave the baby a bath and it was one of the worst experiences that I can —

Q. Would you like some water, Mr. Lloyd?

A. Yes, please. I'm sorry.

Q. Well, do the best you can. This is an emotional case for everyone. If you are able to proceed —

A. But she was filthy." [3]

Arthur Lloyd further testified that from the time the appellant and his son, Dale, separated in the fall of 1970 until December of 1972, the appellant did not come to his house to visit with Sandra. He also testified that he received no cards, gifts or letters for Sandra from the appellant during that time. The appellant did telephone Mr. Lloyd on three occasions regarding visitation rights. Mr. Lloyd consulted Master Hutchinson who told him that no visitation rights had been included in the order granting the Lloyds custody. Mr. Lloyd sent a letter to the appellant explaining the situation which was returned undelivered. Quite some time after eventually informing the appellant that no visitation rights were allowed, her attorney contacted Mr.

---

**3.** A social worker testified, however, the child appeared well cared for when she visited the mother by appointment on January 28, 1971. The trial judge did not evaluate this testimony nor that of the Lloyds.

Lloyd regarding visitation. Mr. Lloyd testified that at no time during any conversation he had with appellant did she ask about Sandra's welfare. The appellant herself testified that the last card or present she sent to Sandra was in June 1971.

It was shown that at the time of the trial, March 1974, the appellant had been living in a two bedroom apartment with her 2½ year old son for over a year and that she had been penalized several times for late rental payments. She had begun work with the telephone company in April 1973, but had been off work from November 1973 until the trial because of illness. She was to begin working again in April 1974. Although the appellant intimated that arrangements had been made to provide a babysitter for Sandra and her other child when she returned to work, both the appellant's grandmother and her prior babysitter testified that they would not be available for such services in the future. The appellant also testified that she planned to get married in the future. Efforts to serve her prospective husband with a subpoena proved futile. Mrs. Geraldine Tindler of the Department of Juvenile Services recommended that custody of Sandra be returned to the appellant but tempered her recommendation by saying that if in the next six months the appellant was unable to make a home her recommendation would change. It also appears that Mrs. Tindler's recommendation was made with no knowledge of the appellant's work record and with the understanding that babysitting arrangements had been made in the event Sandra was returned to the appellant.

There is no question from the transcript of the proceedings below that the appellees are fit to care for Sandra. Mr. Schutes is 41 years old and a Lieutenant Colonel in the Air Force. He and Mrs. Schutes have been married for 19 years and have three sons of their own. They live with their children and Sandra in a large house purchased specifically so that Sandra could have a bedroom of her own. Both of the appellees are in excellent health and are active in local church affairs. Numerous witnesses testified as to the character and stability of the appellees.

There was also substantial testimony regarding the easy and complete adjustment Sandra has made to the Schutes' household and vice versa. Since coming to live with the appellees, Sandra became virtually a member of the family. She considers the appellees her mother and father and their children as her brothers. She has never mentioned her natural mother and father. She gets along excellently with the three Schutes boys and has numerous playmates in the neighborhood. She considers her name to be Sandra Schutes. She attends a local pre-school class and does well. In short, Sandra has, in the words of one witness, "Blossomed like a rose," since living with the appellees.

The chancellor also heard evidence relating to the effect returning Sandra to the appellant would have on the child. Rosa Bolen, the director of Sandra's pre-school class, testified that such a move would be "devastating" to Sandra. Arthur Lloyd testified that in his opinion if Sandra was removed from the appellees' home "it would ruin her." Margaret Crawley, a friend and former neighbor of the appellees, said Sandra would have an extremely difficult time readjusting if she were to be removed from the atmosphere and environment of the appellees' home. Stewart E. Barstad, an Air Force Chaplain and an expert in the field of counseling and planning, testified that there would be great detriment to Sandra in removing her from the appellees' home and that such an adjustment could leave "some pretty serious marks on a person." Dr. Robert G. Wilkerson, a psychiatrist specializing in child psychiatry, testified that as a result of his interviews with the appellees and Sandra, he was convinced that Sandra believes the appellees are her "sole and only parents" and that she has no recollection of her past or her natural mother. Dr. Wilkerson further testified that removal from the appellees' home or a gradual process of reinstituting the natural mother through visitation would be a significant risk to Sandra's psychological makeup and that it would "set her [Sandra] up so to speak, for various sorts of psychological difficulties in the future." He also stressed the critical age from the years four to seven. He also foresaw the real possibility of treating

Sandra in the near future as a psychiatric patient if she were to be removed from the appellees' home.

After taking testimony and receiving exhibits which together produced a transcript of over 1,000 pages, the chancellor found that the appellant had withheld her consent to the adoption against the best interests of Sandra. We hold that the chancellor was correct in so doing and we therefore affirm his decision.

Md. Code, Art. 16, § 74 (b) requires the consent of both natural parents to the adoption "if they are alive and have not lost their parental rights through court action or voluntary relinquishment or abandonment." With respect to consents, § 74 provides, as does Md. Rule D73, that a court may decree an adoption without consent "if, after a hearing the court finds that such consent or consents are withheld contrary to the best interests of the child." Dale Lloyd, the natural father, consented, so, of course, we restrict our discussion to the lack of consent by the appellant.

In any adoption case the best interests of the child is a primary consideration. *Walker v. Gardner,* 221 Md. 280, 284, 157 A. 2d 273 (1960); *King v. Shandrowski,* 218 Md. 38, 43, 145 A. 2d 281 (1958); *Schwartz v. Hudgins,* 12 Md. App. 419, 424, 278 A. 2d 652 (1971). The test as to what amounts to the best interests of the child depends on the facts in each case. *King v. Shandrowski, supra* at 42. In *Shetler v. Fink,* 231 Md. 302, 190 A. 2d 76 (1963), the Court of Appeals reviewed cases decided by it dealing with unjustifiably withheld consent. It said at 308:

"While all the facts and circumstances in a case must be considered, the cases, which reached this Court on the merits of the question whether or not adoption should be granted, seem to indicate that willful abandonment, failure to contribute to support, neglect to see or visit, and unfitness of a natural parent, are some of the important factors to be considered in determining whether consent has been injustifiably withheld; and that station in life and financial and religious considerations are of

> secondary importance. On the other hand, the
> natural rights of a natural parent that have not
> been lost or forfeited by his or her acts or conduct
> must be carefully weighed and considered in
> deciding the question."

Although the rights of the natural parent, or parents, must
be closely considered and although without a natural
parent's consent, the case for adoption must be strong, there
is no right to "an absolute, arbitrary veto on the part of the
parent." *Walker v. Gardner, supra* at 284; *Lagumis v. Ex
Parte Lagumis,* 186 Md. 97, 106, 46 A. 2d 189 (1946);
*Schwartz v. Hudgins, supra* at 425.

Our close scrutiny of the testimony and the exhibits lead
inexorably to the conclusion that it is in the best interests of
Sandra that she be adopted by the appellees. In *Atkins v.
Gose,* 189 Md. 542, 56 A. 2d 697 (1948), a case factually very
similar to the case at bar, the Court affirmed a decree
granting adoption to foster parents over the objection of the
natural mother.[4] After noting the great progress the natural
mother had made in improving herself, the Court went on to
decide, however, that it was in the best interests of the child
to be adopted by the foster parents with whom he had
previously been placed. In that regard the Court stated at
550-551:

> "In the case at bar it is admitted by all parties
> that the appellees are ideal foster parents and that
> the infant has responded to the love and care which
> he is receiving. The relationship between the child
> and the prospective adopted parents leaves nothing
> to be desired. A happy future with the adopted
> parents seems to be assured."
> * * *
>
> "We do not feel that we should remove this infant
> from the highly satisfactory surroundings in which

---

4. Atkins was decided before the enactment of current Art. 16, § 74.
However, the Court's analysis dealt primarily with the best interests of the
child.

he now is, deprive him of the love and care which he is now receiving, and an honorable name. To do so would place him in the unstable environment of his mother, to satisfy her commendable and natural maternal affection for the infant whose custody she has had for only about one year since its birth. This would mean another removal of this very young child from 'pillar to post'. It would hardly be to John's best interests to do so."

The Court in reaching its decision in *Atkins* stressed the fact that the child's future with the natural mother was uncertain and problematical, while his future with the adoptive parents was certain and optimistic. We think the same rationale used in *Atkins* applies to the instant case. Here, while the appellant has made some progress in stabilizing her chaotic life, a fact for which she should be justly praised, her future, and thus the future of Sandra, is very uncertain. On the other hand from all the evidence it is clear that Sandra is thriving in the appellees' home and that with them her future is certain and highly optimistic.

We are also acutely aware of the effects a removal of Sandra from the appellees' home would have upon the child. To subject Sandra to such psychological and emotional disruptions, to shunt her once again from "pillar to post" can hardly be said to be in her best interests.

The appellant argues that the decree below was premature. The theory of a "premature adoption" was expressed in *Lippy v. Breidenstein,* 249 Md. 415, 240 A. 2d 251 (1968) and *Brendoff v. Titus,* 22 Md. App. 412, 323 A. 2d 612 (1974). While we realize the desirability in certain factual situations typified by *Lippy* and *Brendoff* of invoking the "premature adoption" doctrine, the case at bar is not one of those situations. In both *Lippy* and *Brendoff,* the non-consenting natural parent had stabilized their lives to a much greater degree than the appellant in the case at bar. In both *Lippy* and *Brendoff,* the non-consenting natural parent had visited with and shown the "niceties of affection"

for the child—in *Lippy* until the child was 3¹/₂ years old, in *Brendoff* weekly until the hearing. In short in both *Lippy* and *Brendoff* the child had some very real recollection of the natural parent. In the case at bar there is no such recollection of the appellant by Sandra. *See Schwartz v. Hudgins, supra* and *compare Watson v. Dockett,* 229 Md. 63, 181 A. 2d 461 (1962). The devastating effects of a change in Sandra's status now, or in the future were discussed at length above. We need only add that further litigation regarding Sandra's adoption in the future when she is older and able to understand may well be even more devastating. Sandra's best interests are served by finalizing her status *at this time* rather than placing her in legal limbo.

The appellant finally contends that the chancellor erred in considering the factors contained in Article 16, § 75 which deals with guardianship and the right to consent to adoption. She argues that in making reference to those factors the chancellor shifted the burden of proof in that § 75 raises a presumption against the natural parent while § 74, under which these proceedings were brought, does not. The appellant's contention overlooks the pellucid statement made by the chancellor in his oral opinion:

> "Now, let's look at that section — and again for the record I want to make it clear that I realize and understand that this section is speaking only of guardianship, with the right to consent to an adoption, or long term care, short of an adoption, but it is also speaking of that situation without the consent of the natural parent or parents. And I'm really saying that here the burden is still on the Schutes to convince us that this adoption by them would be in the best interest of Sandra, and I'm not saying that this Article 16, Section 75 in any way shifts any burden, or makes any presumption insofar as an adoption is concerned. But I want to discuss the items which are mentioned here as items to be considered in the evaluating the best interests."

We hold that the appellees met their burden of proof on the record before us.

*Decree affirmed.*
*Appellant to pay the costs.*