239 N.W.2d 289 (1976)
In the Interest of M. L. et al., Children.
Paul ELLINGSON, Petitioner and Appellee,
v.
M. L. et al., Respondents and Appellees, and
D. L., their mother, Respondent and Appellant.
Civ. No. 9155.
Supreme Court of North Dakota.
February 25, 1976.
Rehearing Denied March 12, 1976.
*290 Lewis C. Jorgenson, Asst. State's Atty., Devils Lake, for petitioner and appellee Paul Ellingson.
Lawrence J. Lange, Devils Lake, for M. L., E. L., and G. L., minors, and pro se as guardian ad litem.
Haugland & Heustis, Devils Lake, for E. L., the father, respondent and appellee, argued by Evan Heustis.
Bruce E. Bohlman, Grand Forks, for D. L., the mother, respondent and appellant, argued by Mr. Bohlman and Larry Baer, senior law student, Grand Forks.
VOGEL, Justice.
This is an appeal from a determination that three children are "deprived," as that term is used in the Uniform Juvenile Court Act, Chapter 27-20, North Dakota Century Code, and from a disposition thereunder placing the children in the custody of their natural father, who had been divorced from the natural mother in an action in which the mother was granted custody of the children.
The proceeding was commenced by a petition of Paul Ellingson, a Ramsey County social services worker, requesting a determination that the children were deprived. The action was brought against the mother and the father of the children. Three hearings were held, on June 21 and September 8, 1974, and on April 4, 1975. At the first two hearings the court found the children to be deprived, under the terms of Section 27-20-02(5)(a), N.D.C.C., and placed the children in temporary foster care in the home of the paternal grandparents. In the final hearing the trial court again found the children to be deprived and ordered placement in the home of the natural father. It *291 is from this judgment that the mother appeals.
The parents were married on February 14, 1969. There were three children, a boy who is now six years of age, a girl who is five, and a boy who is three. The parents were divorced in January, 1974. The mother was awarded custody of the children under an agreement which was approved and incorporated into the judgment of the court.
After the divorce, the mother suffered emotional problems and was committed to a hospital for psychiatric treatment. While the involuntary commitment procedure was used, she apparently was willing to enter the hospital, realizing that her emotional problems needed treatment.
Three days after her hospitalization, she was served with notice of a hearing based upon the petition of Mr. Ellingson to have her children declared "deprived children." She arrived at the county seat at four o'clock in the morning on the day of the hearing. An attorney was appointed to represent her and consulted with her during a recess. He did not put her on the witness stand. A different attorney represented her at subsequent hearings and in the Supreme Court.

SCOPE OF REVIEW
Before proceeding further, we note that our scope of review in juvenile cases under Chapter 27-20, N.D.C.C., is different from and broader than in other cases tried to the court. In fact, it is much like our former practice of trial de novo. See In re A. N., 201 N.W.2d 118 (N.D.1972), where this conclusion was reached after examination of Rule 81(a), N.D.R.Civ.P., which excepted the operation of the juvenile court Act from Rule 52(a). The broad scope of review is derived from the language of Section 27-20-56(1), N.D.C.C., which states:
". . . The appeal shall be heard by the supreme court upon the files, records, and minutes or transcript of the evidence of the juvenile court, giving appreciable weight to the findings of the juvenile court. . . ."
We are therefore called upon to reexamine the evidence and the decision of the court, without reference to the "clearly erroneous" rule of Rule 52(a). In re A. N., supra. See also In re H., 206 N.W.2d 871, 873 (N.D.1973); In re J. Z., 190 N.W.2d 27 (N.D. 1971); In re Walter, 172 N.W.2d 603, 604 (N.D.1969); and State v. Myers, 74 N.D. 297, 22 N.W.2d 199 (1946).
If this were the ordinary controversy over custody in a divorce case, Rule 52(a) would apply and the trial court's findings would not be set aside unless clearly erroneous, and we would recognize that broad discretion which is vested in the trial court in custody matters. Matson v. Matson, 226 N.W.2d 659 (N.D.1975); Silseth v. Levang, 214 N.W.2d 361 (N.D.1974); Goff v. Goff, 211 N.W.2d 850 (N.D.1973).
Under the Uniform Juvenile Court Act, however, the entire jurisdiction of the court is dependent upon a finding that the child is in fact "deprived." That term is defined in 27-20-02(5)(a), N.D.C.C. A child is "deprived" if he "is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals, and the deprivation is not due primarily to lack of financial means of his parents, guardian, or other custodian; . . ."
Since we find that the court erred in finding the children here involved to be deprived, we reverse.

HEARING OF JUNE 21, 1974
The action was brought by the State, so it had the burden of showing, by clear and convincing evidence, that the children were deprived. Sec. 27-20-29(3), N.D. C.C. The State's evidence consisted largely of the testimony of Paul Ellingson, the social worker who had filed the petition. It related to the period of time after the divorce *292 when the mother was having emotional problems. He said that he, as her case worker, had not seen her "actually having problems with taking care of the children"; that he had seen her once "when she got extremely upset with the children and . . . yelled"; and that she told him about an incident when she was angry and spanked the little girl and that she had felt "let's say, out of control." He also stated that the child was not bruised and that the information had been volunteered by the mother. He also testified to another incident when he visited the mother and told her that the father and his fiancee were "looking around checking into seeing if they could possible get the children" from her. Upon hearing this news, she got "extremely upset and immediately ran for a bottle of pills . . . and started heading out the door for the car." The pills were tranquilizers. Later, she told Ellingson that she had attempted suicide.
It apparently was these incidents which led to the commitment hearing and subsequent hospitalization. A Bismarck psychiatrist examined her and recommended approximately two months' therapy. Apparently these facts motivated Ellingson to file the deprivation petition.
On cross-examination, Ellingson admitted that he knew of no occurrences when the children were not properly cared for other than the spanking incident and the suicide reference described above. He said that the children had never been left without proper food, clothing, or shelter, that the children and their mother displayed affection for each other, that the children appeared to be developing normally in every respect, and that the only reason he had petitioned the court for a finding of deprivation was the mental condition of the mother after her divorce. He was asked: "Was there any indication that these children were deprived children, without parental care and proper control, prior to the indication that [the mother] was mentally ill?" He answered: "Not physically, no, and if emotionally, I had not noticed it."
A neighbor testified that prior to the hospitalization the mother had made suicidal statements and once said she would like to see the children dead along with herself.
The father, who has never asked the court to modify the divorce decree giving custody to the wife, testified that he was currently living with his fiancee who was obtaining a divorce in another State. He expressed his intention to marry her and set up a home suitable for the children in the event he should obtain custody.
The foregoing is substantially all the evidence on the issue of deprivation before the trial court. The mother's attorney moved for a dismissal of the proceedings on the ground that the evidence of deprivation was inadequate to sustain the finding that the children were deprived, and he pointed out that apparently the disability of the mother would be of short duration, not more than two months if she sought proper treatment.
The court denied the motion and held that the facts established deprivation by clear and convincing evidence. Although the point is not clearly before us, because in oral argument counsel for appellant conceded that the present appeal is only from the trial court's finding of deprivation at the second and third hearings, we note that this court held in In re J. V., 185 N.W.2d 487 (N.D.1971), where the mother was suffering from emotional stress, the child was placed in a licensed foster home selected by the county welfare board under a juvenile court order, and there was no evidence of a lack of proper care in the foster home, that the evidence did not support a finding of deprivation. The J. V. case concerned a final order of termination of parental rights, but it is analogous to the facts before us here because in both cases the mother was faced with losing custody of her children to another party. The present case is very nearly identical factually to In re J. V. It is uncontroverted that the mother's absence from the home was beyond her control, and yet it is her absence which the agency contends *293 deprives her children of "proper parental control" under the section defining "deprivation." If we were to agree to this proposition, we might be discouraging divorced custodial parents suffering from emotional disturbances in the aftermath of divorce from seeking treatment for fear they might lose custody of children either to the other parent or to a welfare agency.
During the dispositional portion of the hearing, the trial court noted that it would review its findings in three months and instructed the mother to complete her therapy and admonished the father to straighten out his tangled housing situation with his fiancee. The court then ordered temporary placement of the children with the paternal grandparents.

THE HEARING OF SEPTEMBER 9, 1974
Testimony established that the mother, after the June 21 hearing, went to Alaska in an attempt to make a new life for herself. She found employment as a housekeeper for a family with small children. The parents trusted her to take care of the children for as much as a week at a time during their absence. She began a program with a social services psychiatrist and a clinical psychologist and social workers. Her employers, who lived in a 15-room home, encouraged her to bring her children from North Dakota to Alaska and live in their home if she could obtain custody. Her psychiatrist reported on her improved condition in a letter stating that she sustained a very positive relationship with the employers, who valued her services highly and offered her a permanent position and invited her to have her children join their household. He stated that he and the other professional staff members of his clinic are in disagreement with the recommendations from the psychiatric evaluation in North Dakota: "By no stretch of the imagination could she be considered to be in need of psychiatric hospitalization at the present time and the recommendation that she would require long term hospital care seems totally incompatible with her present level of functioning. . . . In my opinion [she] has truly taken charge of her emotional life and is now functioning at a level where she would be quite capable of resuming the responsibility for her own children."
The reports of the other professionals were equally favorable.
In the interim between the two hearings, the father had remarried. His new wife had custody of one child from a former marriage, while her former husband had custody of her other three children.
The trial court again refrained from making a disposition order and continued the hearing until March 1, 1975, continued by agreement of the parties until April 4, 1975. The postponement, the judge stated, was made in order to give the parties more time to solidify their plans for the eventual return of custody of the children to one of the parents. He told the mother that one reason for the extra time was to give her time to sever relations with a married man in Alaska. The temporary placement of the children with the paternal grandparents was continued.
From the transcript it appears that there might have been some confusion during this hearing as to the capacity in which the court was acting. The court correctly noted several times that the hearing was a deprivation hearing in juvenile court and would have no bearing on the custody granted by the divorce decree. But in finding deprivation the court made the following statements:
"In this instance, there was a divorce, the parties signed and agreed to a stipulation settling matters of custody, of child support and property, and this was an arrangement that was voluntarily entered into by these parties, by [the father] here and by [the mother], nobody forced them to sign that agreement. That was their agreement. The agreement at the time was [the mother] was to have the children and [the father] was to have right of visitation, reasonable visitations.

*294 That was the agreement of the parties, and the law is simply that I may not alter or modify that agreement after it is adopted in a divorceif this was doneI may not modify or alter that unless there is a material change in circumstances. What is the change of circumstances herethe change herethe change of circumstances is that [the mother] has had medical problems, been down at the hospital, apparently has received some treatment, has made progress. Is she back in the position she was at the time that [the father] here signed the agreement.
"[The father], on the other hand, sayswell I have married again since I signed this agreement. Marriage in itself is not sufficient to modify a divorce judgment. It is not considered a material change in circumstances.
"We are concerned with the best interests of the children.
.....
"I am not going to give [the father] the children here today. I am not going to give [the mother] the children. I am going to continue this hearing for a period of six months. During that period of time I expect [the mother] is going to make very definite arrangements as to her future. I am not saying for a moment here that either party is not qualified to have these childrennot saying that for one momentbut I do think 60 days is not enough time to solidify plan for [the mother] up in Alaska.
"Now for me to modify a divorce judgment, as I say, it takes a material change in circumstances, but as far as a deprived child petition is concerned just as soon as these children have reasonable parental care, this proceeding will be dismissed, but as I say, there must be some material change in circumstances. Because [the mother] has been down to mental hospital, received mental treatment, does not mean [she] cannot recover to handle these children. She most certainly can."

THE HEARING OF APRIL 4, 1975
The March hearing was continued until April 4 by agreement of the parties. Since the last hearing, the mother had returned to Alaska and remained there. She had secured full-time employment working as an X-ray technician's assistant at a hospital. She testified that her present salary was approximately $600 per month and that she was taking extra training to become an X-ray technician in order to increase her earning capacity. Her testimony was supported by a letter from one of her supervisors on the hospital staff praising her ability and hard work. During this interval she had received her high school diploma and received a clean bill of health from the clinical psychologist with whom she had been in therapy. She moved from the residence of her former employer and established her own household in a mobile home in anticipation of regaining custody of her children. She also testified that her relationship with the married man was terminated.
The trial court acknowledged the mother's great strides in bettering her life:
". . . all of us involved in these affairs recognize that [she] has made tremendous progress and improvement."
The court listened to extensive testimony by social workers who had visited the home of the father and his new wife, commenting favorably on that home environment for the children. It also had numerous reports of psychologists and social workers in Alaska, all highly favorable to the mother.
The court then proceeded with its disposition of the case, first emphasizing the fact that the custody decree under the divorce still stood. The judge again found "that the children are deprived . . . by clear and convincing evidence." He then went on to say that testimony had established
". . . that the home of [the father] is a proper place for the children. There *295 is no testimony that [the mother's] present home is improperher testimony is uncontroverted that she has a trailer home with room for the children. So it is not question here that one home is improper and the other home is proper. The question I am presented with is make some disposition, and it appears from the evidence standing before the court that both homes are proper homes for the children. In any finding I make is not going to the effect that one home or the other is improper. I do not mean to be misunderstood in making that finding."
The court then ordered custody of the three children to be given to the father and his present wife, subject to visitation rights in the mother.
Using our broad scope of review, we find that the evidence at the September 9, 1974, and April 4, 1975, hearings does not sustain a finding of deprivation. In our view, the evidence is not clear and convincing to the effect that the children were "without proper parental care or control, subsistence, education as required by law, or other care or control necessary for [their] physical, mental, or emotional health or morals, . . ." N.D.C.C. § 27-20-02(5)(a). We held in In re J. V., supra, that the mother's absence temporarily for treatment did not make the children "deprived." We believe the evidence at the last two hearings clearly shows that the mother was rehabilitated and the court so indicated in its findings. If so, the petition should have been dismissed because jurisdiction no longer existed. When the custodial parent was ready, willing, and able to resume proper parental care and control, the children were no longer deprived, if they ever had been, and the juvenile court's power to order dispositional alternatives under Section 27-20-30, N.D.C.C., was terminated. See In re J. Z., supra. The primary question before the court was not a question of what was in the best interests of the children, or whether circumstances had changed sufficiently to justify a change of custody in a proceeding ancillary to divorce, but whether the children were within the statutory definition of deprived children. We hold that they were not.
It is true, as the father urges, that a petition for modification of the divorce decree as to custody could have been heard in the same court and perhaps by the same judge who conducted the deprivation hearing. But it is also true that due process requires notice of a hearing and of the general nature of the issues to be heard and an opportunity to prepare. Here, the mother was told that the hearings were to determine whether the children were "deprived," that the court was not going behind the divorce stipulation for custody and the judgment based upon that stipulation, and that any orders based upon the finding of deprivation would be terminated when the deprivation ended. The respondents were entitled to rely upon the designation of the kind of case and the kind of court they were in, and to plan their trial tactics accordingly. See, generally, Hull v. Rolfsrud, 65 N.W.2d 94, 98 (N.D.1954), and McGuire v. Warden, 229 N.W.2d 211, 218-219 (N.D. 1975). The attorney for the mother says that his tactics would have been different, and he would have called other witnesses, if the issues had been the best interests of the children and whether the circumstances of the parties had materially changed since the divorce decree. We do not doubt that statement.
There are other crucial differences between a deprivation hearing under the juvenile court Act and a custody hearing under the divorce statutes. In the former, the State is a party, while in the latter it is not. The burden of proof is different: In the one case clear and convincing evidence is required, while in the other only a preponderance is necessary.
And, finally, on this point, a great deal of hearsay evidence was properly admitted [see § 27-20-29(4), N.D.C.C.] in the deprivation hearing which would have been inadmissible in a change-of-custody hearing. *296 This evidence included the psychiatric reports of the Bismarck psychiatrist and the psychiatric and psychological reports from Alaska. None would have been admissible without further foundation in an ordinary custody hearing. For all these reasons, we believe it was essential to restrict the deprivation hearing to matters appropriate to that kind of hearing, and it was inappropriate to treat it as the equivalent of a divorce custody proceeding.
There appeared to be some concern among the participants in the trial court hearing about the fact that the mother had moved to Alaska and intended to remain there with her children if she were given custody. This court has recognized the right of a custodial parent to leave the jurisdiction [Moran v. Moran, 200 N.W.2d 263 (N.D.1972)], and other courts have held that even a transcontinental change of residence is not a material change in circumstances warranting a change in custodial rights [Warder v. Warder, 203 N.W.2d 531, 533 (S.D.1973)]. We also note that the Uniform Juvenile Court Act contains provision for out-of-State supervision governing dispositions. Sec. 27-20-41, N.D.C.C. The Alaska social services agencies are clearly able and willing to cooperate in this case. We have no reason to suspect that such cooperation would not be forthcoming. Any assumption to the contrary would be parochial and chauvinistic.
This is not to say, however, that the court cannot give consideration to the fact that great distances will reduce visitation rights. But that question was not properly before the court here.

CONCLUSION
The finding that the minor children were deprived children on April 4, 1975, is not sustained by the evidence.
The dispositional order awarding custody of the children to their father is reversed and the case is remanded to the district court for entry of an order placing custody in the mother, who is the custodial parent under the divorce decree, subject to the visitation, support, and other provisions of the divorce decree.
ERICKSTAD, C. J., and PAULSON, PEDERSON and SAND, JJ., concur.