Mary Charlotte KOTTSICK and Virgil Kottsick, Appellants,

v.

Reuben E. CARLSON, as Administrator of the Division of Child Welfare of the Public Welfare Board of the State of North Dakota, and John Joseph Carney, Appellees.

No. 9184.

Supreme Court of North Dakota.

April 22, 1976.

Rehearing Denied May 12, 1976.

Daniel J. Chapman, Bismarck, for appellants.

Pearce, Anderson, Pearce, Thames & Pearce, Harold L. Anderson, Bismarck, for appellees.

SAND, Justice.

This is an appeal from an order of the District Court of Burleigh County dismissing the petition of the appellants Mary Charlotte Kottsick and Virgil Kottsick to adopt the minor children, Sean Carney and James Carney.

John Carney and Mary Kottsick were formerly husband and wife and are the natural parents of Sean and James. Sean was born in July 1968, and James in April 1971. A divorce decree was entered in Florida in October of 1972 dissolving the marriage and awarding custody of the children to Mary with visiting rights to John, and requiring John to pay $175 a month for child support, which payments have been made.

In May 1973 Mary and Virgil Kottsick were married. Mary and the two boys moved into the home of Virgil and his three daughters in Bismarck, North Dakota.

Subsequently, this action was brought in which Virgil Kottsick seeks adoption of Sean and James and to thereby terminate the parental rights of John Carney, the natural (biological) father.

Upon trial, the court issued a judgment denying the petition for adoption. The appellants now claim that the trial court erred in its interpretation and application of the law, specifically § 14–15–19(3)(c), North Dakota Century Code, and ask that the judgment be reversed, or that the matter be returned to the trial court with directions to apply the correct interpretation and concepts of law.

The right of adoption in this country is purely statutory in nature and exists only by virtue of statute. There was no right of adoption under common law of England even though the practice existed in ancient countries and was recognized in civil law before the time of Justinian. 2 Am.Jur.2d *Adoption* § 2, p. 861; 2 C.J.S. *Adoption of Persons* § 3, p. 420. Adoption statutes were passed "for the beneficent purpose of creating an artificial relationship of parent and child." *Hoellinger v. Molzhon,* 77 N.D. 108, 41 N.W.2d 217, 220 (1950).

Adoption is provided for in North Dakota by Chapter 14–15, NDCC, also known as the Revised Uniform Adoption Act. Only two other States, Oklahoma[1] and Montana,[2] have adopted the Uniform Act in a form similar to the original.

Before Virgil Kottsick can legally adopt Sean and James, the legal relationship (parental rights) of the natural father, John Carney, with the two boys must first be terminated. However, Carney has refused to consent to the termination of his parental rights and the adoption. Section 14–15–05(1)(b), NDCC, requires that the natural father of the child consent to any adoption, unless this consent is not required under § 14–15–06. Section 14–15–06 states that consent to adoption is not required if the parent's rights have been terminated under § 14–15–19. Section 14–15–19, NDCC, is entitled "Relinquishment and termination of parent and child relationship." Paragraph 3 of this section defines those situations in which the parent-child relationship may be terminated by the court without the consent of the natural parent. These are: " . . . (a) that the minor has been abandoned by the parent, (b) that by reason of the misconduct, faults, or habits of the parent or the repeated and continuous neglect or refusal of the parent, the minor is without proper parental care and control, or subsistence, education, or other care or control necessary for his physical, mental, or emotional health or morals, or, by reason of physical or mental incapacity the parent is unable to provide necessary parental care for the minor, and the court finds that the conditions and causes of the behavior, neglect, or incapacity are irremediable or will not be remedied by the parent, and that by reason thereof the minor is suffering or probably will suffer serious physical, mental, moral, or emotional harm, or (c) that in the case of a parent not having custody of a minor, his consent is being unreasonably withheld contrary to the best interest of the minor."

There is no claim or evidence that John Carney has been guilty of any of the conduct described in (a) or (b), or of any conduct which would constitute grounds for termination of his parental right. Kottsick contends that (c) applies and that under the facts of this case the court can terminate Carney's parental rights and permit the adoption of his sons. Kottsick argues that Carney is a "parent not having custody of a minor"; therefore he, Kottsick, pursuant to (c) merely has to show that Carney is unreasonably withholding consent to the adoption, contrary to the best interest of the children.

The legal meaning of the word "custody" as used in the statute, § 14–15–19(3)(c), is of prime importance and we must therefore first determine if it means physical possession or custody, temporary control, constructive custody, custody as used in a divorce proceeding, or something else, before we can resolve the main question.

The Commissioners' note to § 19 of the Uniform Adoption Act, 1969 Revised Act (the source for the North Dakota Act),

1. Oklahoma statute permits adoption without the consent of the parent if the parent has been declared an habitual drunkard or had been judicially deprived of custody of the child on account of cruelty to or neglect of the child, or if the parent willfully failed, refused, or neglected to contribute to the support of the child in accordance with the decree of divorce or in accordance with his financial ability.

2. Montana statute has substantially the same provisions as the statutes of Oklahoma, except additional provisions are added, such as abandonment of the child or having the child placed in an institution maintained by the public.

states that 3(c) "can be used in a case where a stepparent and the mother are in custody of the child but the natural father refuses to give consent, and withholding of consent is found by the court to be contrary to the best interests of the child. It cannot be used, however, to excuse the absence of consent of a parent who is in legal control of his child or who has custody of the child." 9 ULA Uniform Adoption Act § 19, p. 139 (1972).

The Commissioners' notes are not very informative or helpful toward the resolution of the question under consideration because they do not adequately explain the meaning of the terms "custody" and "legal control" as used in the statute. Whatever explanation appeared in the notes was obtenebrated by the use of those same terms in the explanation.

■ The term "custody" has variable meanings and is not easily defined. It takes full meaning from the manner and circumstances, as well as the context in which it is used. It is not the same as "parental right." There is a vast difference between the termination of parental rights and the awarding of child custody without termination of the parental rights. Adoption proceedings include, amongst other things, termination of parental rights if not previously terminated.

■ In determining the meaning ascribed to the term "custody" by the Legislature, we must take into account and consider the objectives and purposes of the legislation as well as the position and relation such legislation has with other laws enacted contemporaneously touching upon the same or similar matters and their chronological significance, if any.

We must also consider the applicable statutory guidelines established by the Legislature as an aid to the courts on the interpretation and construction of statutes.

One of them is § 1–02–38, NDCC, which states:

"In enacting a statute, it is presumed that:

"1. Compliance with the constitutions of the state and of the United States is intended.

"2. The entire statute is intended to be effective.

"3. A just and reasonable result is intended.

"4. A result feasible of execution is intended.

"5. Public interest is favored over any private interest."

Another one is § 1–02–39, NDCC, which states:

"If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:

"1. The object sought to be attained.

"2. The circumstances under which the statute was enacted.

"3. The legislative history.

"4. The common law or former statutory provisions, including laws upon the same or similar subjects.

"5. The consequences of a particular construction.

"6. The administrative construction of the statute.

"7. The preamble."

In 1971, the Legislature enacted Chapter 149, adding irreconcilable difference as another basis for divorce, and through Chapter 157 enacted the Uniform Adoption Act. We would deem the action of the Legislature incongruous to allow the granting of divorce by merely establishing irreconcilable differences so as to partly remove the traumatic effects and then, at the same time, provide that the custody of the children awarded in such "friendly" divorce action be treated as almost the equivalent of termination of the parental rights of the parent who did not receive physical custody, but in fact, probably to avoid bitterness and for the sake of the children, consented to the award. This would be an inconsistent position by the Legislature.

We also take into consideration that the Legislature has set out in § 27–20–44, NDCC, the grounds for termination of parental rights. None of the grounds stated

therein include anything which would be comparable to loss of custody in a divorce proceeding or the equivalent of not having been awarded custody of the children in a divorce proceeding. We are not aware of any language in the Uniform Adoption Act, as enacted by the North Dakota Legislature, which amends § 27–20–44. Amendment by implication is frowned upon.

■ In *Rodgers v. Freborg,* 240 N.W.2d 63 (1976), we said: "Courts hesitate to find an implied amendment of a previous statute." We then quoted from 1A Sands, Sutherland Statutory Construction § 22.13, at 139–140 (4th ed. 1972), as follows:

"Amendments by implication, like repeals by implication, are not favored and will not be upheld in doubtful cases. The legislature will not be held to have changed a law it did not have under consideration while enacting a later law, unless the terms of the subsequent act are so inconsistent with the provisions of the prior law that they cannot stand together."

We have no valid reason to conclude that § 27–20–44, NDCC, has been amended by implication even though some of the provisions are duplicated. All indications are to the contrary and we conclude it has not been amended.

If the word "custody," as used in § 14–15–19(3)(c) were given the meaning that is normally ascribed to such term as used in divorce proceedings, as contended by Kottsick, some serious constitutional questions would arise, particularly as to due process. The criteria used and relied upon by the courts in determining custody in a divorce action are not necessarily the same criteria that will be used by the courts in determining whether or not parental rights should be terminated. The parents in a divorce action could both be equally well suited to be parents, but nevertheless custody can and according to some authorities should be awarded only to one parent. If the custody so awarded would later in an adoption proceeding coupled with termination of parental rights require the parent to consent unless the parent has reasonable grounds

for refusing, the divorce proceedings would in effect be tantamount to a termination of parental right which was not an issue at the time of the divorce proceedings. A custody dispute frequently is an embittered emotional situation which may have unfavorable traumatic effects on the child or children. If the custody proceeding in a divorce were to carry with it the equivalent of parental right termination the dispute would become more embittered and without question the child or children would suffer from such bitter dispute. We do not believe that the Legislature meant to bring about such consequences when it enacted § 14–15–19(3)(c). Neither should we construe the statute to bring about such undesirable consequences.

The United States Supreme Court in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, held that an unwed father, upon the death of the mother of the children, pursuant to the Due Process Clause, is entitled to a hearing as to his fitness before his children are taken from him. A plurality of the Court also held that he is entitled to a hearing under the Equal Protection Clause as to his fitness before the children may be removed from his custody.

■ If an unwed father has a right to a hearing as to his fitness, and *Stanley* has so held, the right of a married father, divorced from the mother, certainly cannot be any less. The married father, John Carney, is entitled to more than merely being permitted to show that "his consent is being unreasonably withheld contrary to the best interest of the child." He is entitled to a hearing on the fitness question and related questions as applied to all parents.

If a custody award in a divorce decree were construed to be almost the equivalent of permanently depriving the noncustodial parent of his parental rights, without any hearing as to his fitness, it would raise the issue of denial of due process, and possibly equal protection, under the Fourteenth Amendment to the United States Constitution. This would be the result if we were to give the term "custody," as used in § 14–

15-19(3)(c), the same meaning as such term has in a divorce proceeding where children are the subject of an award.

This court in *Marks v. City of Mandan,* 70 N.D. 434, 296 N.W. 34 (1940), said that if there are two possible interpretations of a statute, one of which would be clearly constitutional, and the other would be of doubtful constitutionality, the court will avoid that construction which would leave the constitutionality of the statute in doubt.

In *State v. Julson,* 202 N.W.2d 145 (N.D. 1972), this court said if a statute is susceptible of two constructions, one of which renders it unconstitutional and the other constitutional, it is the duty of the court to adopt the construction which, without doing violence to the fair meaning of the statute, will render it valid. *See also, Wallentinson v. Williams County,* 101 N.W.2d 571 (N.D. 1960).

In 2A Sands, Sutherland Statutory Construction, (4th ed. 1972), § 45.11, page 33, we find the following statement which we believe is persuasive:

"As a corollary of the presumption favoring constitutionality, the fact that one among alternative constructions would involve serious constitutional difficulties is reason to reject that interpretation in favor of another."

This article continues by saying:

"It has even been said that 'a strained construction is not only permissible, but desirable, if it is the only construction that will save constitutionality.'"

These rules of law are in complete harmony with § 1-02-38(1) and § 1-02-39(5), NDCC.

The foregoing rules militate against giving the term "custody," as used in § 14-15-19(3)(c), the same meaning as is given to such term in divorce proceedings.

A review of the case in which the courts have judicially construed the term "custody" will be of some assistance.

In *Bond v. Carlson,* 188 N.W.2d 728 (N.D. 1971), this court had under consideration § 14-11-04, NDCC, the pertinent part of which read as follows:

"The consent of a parent who has lost custody of the child through divorce proceedings  .  .  .  shall not be required."

This provision has since then been replaced by the Uniform Adoption Act, § 14-15-19(3)(c). The facts in the *Bond* case are very similar to the instant case. The divorce decree awarded custody of the children to the wife, but granted the father visitation rights and ordered him to pay support, which he did. The wife later remarried. She and her new husband then petitioned to have the children adopted. The trial court dismissed the petition and an appeal was taken to this court. This court said that:

"  .  .  .  the divorce decree in this case did not terminate the natural father's parental rights to his children or set forth an adjudication of unfitness, nor was he permanently deprived of custody of the children, and, therefore, he has not 'lost custody' of the children, within the sense and interpretation of that phrase as it is used in N.D.C.C. Sec. 14-11-04." 188 N.W.2d *supra* at 733.

This court specifically observed that a custody award in a divorce decree was subject to modification and was not a permanent deprivation of custody of the father.

Kottsick claims that the *Bond* case is of no significance and is readily distinguishable from the present case because of the different language. We do not agree that it has no significance. Upon careful examination we find that the language in the *Bond* case was stronger than the language in § 14-15-19(3)(c) and is very similar to Kottsick's contended construction of the term "custody" as used in § 14-15-19(5)(c). There is a distinction but it does not aid Kottsick. In the *Bond* case the court dealt with more explicit language, whereas in this case we have only a contended implication arising from the word "custody." The ruling in face of the stronger language in the *Bond* case, we believe, is entitled to considerable weight.

In *Delgado v. Fawcett,* 515 P.2d 710, 712-713, (Alaska 1973), the statute involved

stated that consent for the adoption of a minor was not required from a divorced parent who was not awarded full or part-time custody of the child. The court stated:

> " 'Custody' has no fixed legal signification. It involves a variety of parental rights and duties which vary according to the circumstances of the relationship of the child to the parent. 'Custody' pertains not only to the parental control of the child, but is inseparably linked to the parent's rights of access and companionship with his offspring. There are, of course, no precise contours to the complex of rights denoted by 'custody,' and similarly there can be no fixed catalogue of the parental rights and responsibilities to which 'part-time custody' relates.

> "It may be argued that whenever one parent is awarded full custody of a child and the other visitation rights, under our statute, the consent of the parent possessing visitation rights is not necessary for adoption. We think that such a reading of AS 20.10.040(5) is excessively literal and inconsistent with the legislative intent evident from the statute as a whole. We think that by reserving the right to veto an adoption to parents with 'full or part-time custody,' the legislature intended to include within that class persons who retain reasonable visitation rights to their children."

In *Nelson v. Bye*, 271 Minn. 194, 135 N.W.2d 700 (1965), the court, faced with a statute which stated that consent shall not be required of a parent who has lost custody of the child through a divorce decree, held that the right of the natural father to reasonable visitation and "to take the children with him" for a period of three weeks each year gave him a substantial right of custody so as to require his consent to the adoption.

In *Eggert v. Van De Weghe*, 279 Minn. 31, 155 N.W.2d 454 (1967), the court interpreted the statute considered in *Nelson, supra*, to mean that the consent of a natural parent who does not have custody may dispensed with only where the issue of unfitness was raised and adjudicated in the divorce proceeding and his right to custody was extinguished by the divorce decree.

■■ It is apparent that the courts in the preceding cases refused to give "custody" the same meaning in an adoption statute as is accorded to it in divorce decrees. Granting custody in a divorce procedure and allowing an adoption with its concomitant termination of parental rights are two different matters. In a divorce decree awarding custody the overriding and paramount concern is "the best interest of the child," and usually no determination is requested or made as to the unfitness of a noncustodial parent. On occasion, the custody decree is by consent of the parties. The award in a divorce decree is subject to modification as the circumstances change and the party who was originally denied custody may be given custody in the future. To give "custody" the meaning ascribed to it by Kottsick in § 14–15–19(3)(c), NDCC, would mean that every time a court awards custody to one parent in a divorce action this award has the potential to permanently terminate the other parent's right to the child. The rights of the noncustodial parent could be terminated without any finding of "unfitness" on his part. He would never have a hearing as to his ability or inability to take care of the child. The only determinant the court would look to is which of the parties could best serve the interests of the child. Under the language of the statute the issue could frequently come down to whoever has the nicer house gets the child.

There are several States which have statutes that allow the termination of the natural parents' rights without their consent where it is found to be in the best interests of the child.

The Virginia statute (Va.Code Anno. § 63.1–225, 1974 Anno.) provides that if the court finds that the consent of any person whose consent is required is withheld contrary to the best interests of the child, the court may grant the petition without such consent. The statute does not list cases of parental misconduct which will obviate the consent requirement.

In *Dyer in Howell*, 212 Va. 453, 184 S.É.2d 789 (1971), the Virginia court granted an adoption petition over the objection of a natural parent, implying that it would give little weight to any inherent parental interest in the child and would require only a showing that the adoption was in the child's best interests. The father in that case had been arrested for the murder of his wife and was found not guilty by reason of insanity. He had since been released from the mental hospital.

In *Malpass v. Morgan*,[3] 213 Va. 393, 192 S.E.2d 794 (1972), the Virginia court about one year later distinguished the *Dyer* case, if it didn't in fact overrule it, and denied an adoption petition. The court rejected the contention that a mere showing that adoption would advance the interests of the child would suffice to dispense with parental consent. The court interpreted the statute to mean that, where there is no question of the fitness of the nonconsenting parent and he has not lost his rights to the child by his conduct or through previous legal action, his parental rights will not be terminated unless it has been shown that continuance of the relationship would be detrimental to the child's welfare.

In *Szemler v. Clements*, 214 Va. 639, 202 S.E.2d 880 (1974), the court granted an adoption under § 63.1–225, finding that the best interests of the child would be served thereby. The mother earlier had consented to an adoption and the child was placed in the new home. The mother later unsuccessfully attempted to revoke consent. The court, under these conditions, said that the fitness of the mother would not be in issue but only the best interest of the child would be considered. The court found that the child had been previously neglected by her mother and maintained in sordid surroundings, and that the removal of the child from her present home of adopting parents where the child was being well taken care of would be detrimental to the child. This case involved custody questions as well as the adoption issue.

The Maryland statute (Md.Code Ann. Art. 16 § 74, Repl.Vol.1973) provides that the court may grant a petition for adoption without consent if it finds that such consent is being withheld contrary to the best interests of the child. Also, consent is not required where the parents have lost their rights through court action or abandonment.

In *Logan v. Coup*, 238 Md. 253, 208 A.2d 694, 696 (1965), the court found no voluntary relinquishment or abandonment of the child and had to determine where the best interests of the child lay. The court quoted from an earlier Maryland case, *Shetler v. Fink*, 231 Md. 302, 190 A.2d 76:

"While all the facts and circumstances in a case must be considered, the cases, which reached this Court on the merits of the question whether or not adoption should be granted, seem to indicate that willful abandonment, failure to contribute to support, neglect to see or visit, and unfitness of a natural parent, are some of the important factors to be considered in determining whether consent has been injustifiably [sic] withheld; and that station in life and financial and religious considerations are of secondary importance. On the other hand, the natural rights of a natural parent that have not been lost or forfeited by his or her acts or conduct must be carefully weighed and considered in deciding the question."

The only advantage that the court found which could accrue to the child through the adoption was that the adopting family would be a "closer-knit" one. It held that "in order to justify the drastic action of permanently severing the legal relationship of a fit and proper parent and his child, clear and sufficient legal reasons must be shown as to why such action is needed for the interests and welfare of the child."

In *Beltran v. Heim*, 248 Md. 397, 236 A.2d 723, 725 (1968), the court again denied an adoption petition where the natural parent had refused to consent. The court stated that:

---

**3.** See Virginia Law Review, Vol. 60, April 1974, page 718, at 726, which summarized the *Mal-* *pass* decision and described its probable impact.

"Unlike awards of custody . . . adoption decrees cut the child off from the natural parent, who is made a legal stranger to his offspring. The consequences of this drastic and permanent severing of the strongest and basic natural ties and relationships has led the Legislature and this Court to make sure, as far as possible, that adoption shall not be granted over parental objection unless that course clearly is justified. The welfare and best interests of the child must be weighed with great care against every just claim of an objecting parent."

In *Schwartz v. Hudgins*, 12 Md.App. 419, 278 A.2d 652 (1971), the court allowed adoption under the best interests language where it found that the mother had stopped visiting the child and there had been a complete absence of contact over a two-year period although there was "abundant opportunity" for it.

In *Lloyd v. Schutes*, 24 Md.App. 515, 332 A.2d 338 (Md.1975), the court also allowed adoption under the "best interests" statute. Again, the court looked at the conduct of the mother and found that she had not maintained contact with the child while she was in the custody of the adopting parents and that when the mother had custody of the child she had not been properly cared for. This case also involved custody issues which seemed to affect the court's reasoning.

The Arizona statute (Ariz.Rev.Stat.Ann. § 8–106(c) Supp.1973), reads that the court may waive the requirement of consent when it determines that the interests of the child will be promoted thereby. It does not list parental misconduct which would lead to the obviation of consent.

In *In re Adoption of Krueger*, 104 Ariz. 26, 448 P.2d 82 (1969), the court granted an adoption on best interests grounds. The facts involved an unwed divorced mother who gave up her child for adoption before his birth and later changed her mind and unsuccessfully attempted to revoke the consent.

In *In re Adoption of Baby Boy*, 106 Ariz. 195, 472 P.2d 64 (1970), the court vacated a previous denial of an adoption petition and granted the petition where the facts showed that the father had abandoned the child and failed to support it and the mother, who refused to give her consent, was in jail and had never provided a suitable home for the child.

In *In re Adoption of Hyatt*, 24 Ariz.App. 170, 536 P.2d 1062 (1975), the court refused to grant the requested adoption. The court stated that while the primary consideration is the welfare of the child, this does not mean that the court can sever the parental rights of nonconsenting parents and order adoption merely because the adoptive parents might be able to provide a better home. The court, without referring to any statute, but citing *In re Baby Boy*, which did rely on statutes, held that a parent who has never consented to the adoption may not, over his objection, be deprived of his child without a showing of neglect, unfitness, or dependency.

The Massachusetts statute (Mass.Gen. Laws Ann. ch. 210 § 3, Supp.1973), states simply that consent shall not be required where the court finds that the adoption would be in the best interests of the child. It does not list any other reasons.

In *In re Adoption of Minor*, 327 N.E.2d 735 (Mass.1975), the court decided that the father's interest could be dispensed with under the statute and found that adoption was in the best interests of the child. The facts disclosed that the father showed little interest in the children after they were awarded to the mother in a divorce action and paid no support, except for trifling contributions starting at about the time the petition for adoption was filed by the mother and her new husband. Under the Massachusetts statute the court is to consider the "ability, capacity, fitness and readiness" of the natural father to "assume parental responsibility." The court determined that the petitioners would be better able to assume the responsibilities.

In an earlier case, also entitled *In re Adoption of a Minor*, 343 Mass. 292, 178 N.E.2d 264 (1961), the court found that the

natural mother's action and behavior came within the then statutory provisions providing that consent of a parent is not required if the parent has "wilfully deserted or neglected to provide proper care and maintenance for such child for one year last preceding the date of the petition." Kottsick's reliance upon this case is misplaced.

*Petition of New England Home Little Wanderers*, 328 N.E.2d 854, 863 (Mass.1975), involved a mother who had given up her unborn child to a Home for adoption and later changed her mind and wanted custody returned after ten months. The court held the best interests of the child lay in remaining in its present home. The court found that the mother "took an unrealistic approach to her problems and never worked out a practical way to implement her plans for herself or the child." The court stated:

> "In reaching our conclusion to support the judge's finding we wish to point out with emphasis that we do not lend any approval to dispensing with parental consent for other than substantial reasons."

and further,

> "It is a condition of dispensing with parental consent that the parents be shown to have grievous shortcomings or handicaps that would put the child's welfare in the family milieu much at hazard."

(This was probably more of a custody problem than adoption, which may have influenced some of the language.)

If any conclusion can be drawn from the case law under these statutes, it is that the courts are reluctant to terminate parental rights without a showing of misconduct or neglect on the part of the natural parents, even though the statute states that the best interests of the child are to be the sole or predominant determinant. (These statutes differ somewhat from North Dakota's in that the "best interests" is the only criterion listed for omitting consent. However, it appears parental misconduct or overall conduct must, nevertheless, be taken into account in considering the best interests. The North Dakota statute lists abandonment and misconduct and neglect as separate conditions for determining that consent is not required in § 14–15–19(3)(a) and (b). The best interests condition is listed under (3)(c) in conjunction with the withholding of consent provision.)

Kottsick relies heavily upon *In re Adoption of Tachick*, 60 Wis.2d 540, 210 N.W.2d 865 (1973), where the mother of the child lived with the parents of the father of the child, both prior to giving birth to the child and after having given birth to the child. About two years after the birth of the child a termination of parental rights hearing was held. Both the mother and the father of the child were present. The mother stated she was willing to have her parental rights terminated on the condition the child would be adopted by the Shehows, the parents of the child's father, grandparents of the child (who desired to adopt him.) The court informed her that consent could not be so conditioned, and then terminated her rights over her objection and entered an order accordingly. The grandparents of the child filed petition to adopt the child which was permitted to remain in their home pending the outcome of the petition. The trial court denied the petition for adoption by the grandparents. The father of the child had signed a form of consent to the termination of his rights. The Wisconsin Supreme Court, in discussing the case on appeal, made note of the fact that the State statutes do provide for the best interests of the child but that such term was not defined in the Code. It then observed that the Code lays down the command in subsection (3), "The best interests of the child shall always be of paramount consideration, but the court shall also consider the interest of the parents or guardian of the child and the interest of the public." The footnote refers to the Uniform Marriage and Divorce Act. The Supreme Court also observed, "We think it is significant that the petitioners are the grandparents of the child and have taken care of him since birth." Later in the discussion the Supreme Court stated, "Perhaps this is another way of saying blood is thicker than water. Then, too, the mother desired the grandparents to adopt

the child and her rights were terminated involuntarily." The Supreme Court allowed the petition for adoption by the grandparents against the wishes of the Department. This case is interesting but is not much of assistance to the basic question of whether or not the term "custody," as used in the North Dakota Act (Ch. 14–15, NDCC) means the same as custody awarded in a divorce decree. Neither does it support Kottsick's position or contention.

Kottsick also relies upon *In re Adoption of Zimmerman*, 229 N.W.2d 245 (Iowa 1975). In this case, the father and mother were divorced and the court awarded custody of the child to the mother with reasonable visitation rights to the father, who was also ordered to pay $50.00 monthly child support payments. (The marriage disintegrated into a separation, and was ultimately terminated by divorce.) The mother remarried and her husband filed application for adoption. The natural father resisted the petition for adoption. At the trial it was disclosed that the natural father contributed only $350.00 towards support of the child and that any contributions for support of the child discontinued at the remarriage of the mother. The child was fully cared for and supported by the mother and her new husband. The evidence at the trial also disclosed that the natural father visited the child very seldom and communicated only about four times after separation and divorce, and about seven times since the mother remarried. The Iowa Supreme Court reviewed the denial of the adoption on a de novo basis. It observed that the consent of a noncustodial parent is required for adoption so long as the parent is making any material or monetary contributions to the support of the child. It then referred to the rule of law adopted in *In re Adoption of Vogt*, 219 N.W.2d 529 (Iowa 1974). The court said that a noncustodial parent does not possess power to veto adoption simply because he is afforded visitation rights unless he materially provides for the child's needs. It specifically observed that the noncustodial parent does not have power to veto the adoption merely because he possesses visitation rights.

This case, however, seems to establish that the court is required to view the evidence in light of the competing interests, namely, the interest of the child, the interest of the custodial parent, and the interest of the petitioner. The Iowa court said that the welfare of a child is paramount but not the only consideration. It said adoption is permitted only if a balancing of the competing interests show it is wise.

On careful examination, the *Zimmerman* and Iowa cases do not support Kottsick's position. They are readily distinguishable from the instant case where the natural father has been making financial contributions to the children. (We are, however, not fully convinced that this is the controlling criterion.)

Kottsick also relies on *In re Adoption of Lisa Marie Corcuera, a minor*, 145 So.2d 493 (Fla.App.1962), where a child had been born to Joseph and Barbara Corcuera. Three years later the parents were divorced. Custody and control of the child was awarded to the mother. The mother remarried and she and her new husband filed application to adopt the child. The divorce decree ordered the father to make small payments each week for the child's support, which were made by him. There was testimony that the natural father contributed $208 a year towards the child's support but the actual cost of maintenance was approximately $1300. The petition for adoption was granted and the natural father appealed. The appellate court, on review, said that the evidence indicated that although the father had not completely abandoned the child it demonstrated his lack of interest in the child's welfare, which closely approaches the point of abandonment. It also observed that the infrequent visits by the father were such as to justify a forfeiture of the parental rights afforded him under law. Unfortunately, the case does not refer to any statute nor are we able to find, with any reasonable reliance, the statute, if any, which applied. Therefore, we cannot give the case of *Lisa Marie* the recognition to which Kottsick claims it is entitled. This case may have importance in other respects

but it does not assist in our resolution of the basic issue which pertains to the construction and interpretation of a specific statutory provision, and constitutional rights.

The United States Supreme Court over the years has frequently emphasized the importance of the family. It has recognized that the right to conceive and to raise one's children have been deemed essential, basic, civil rights of man (homo sapiens) which are more precious than property rights. It is cardinal with the court that the custody, care, and nurture of the child reside first in the parents whose primary function and freedom include the child's preparation for obligations which the State can neither supply nor hinder. The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment and the Equal Protection Clause.[4]

■ This court recently, in the case referred to as *In the Interest of M. L., E. L., and G. L., Children, Paul Ellingson v. M. L., etc.,* 239 N.W.2d 289 (1976), in syllabus paragraph 6 said:

"Differences between hearing on deprivation of child in juvenile court and custody hearing in district court are substantial and prevent conversion of former into latter, even though same judge might preside at both."

We would similarly observe that the difference between a custody hearing in a divorce proceedings and a hearing to terminate the parental rights are significant, and that a divorce custody hearing cannot be later converted into a termination of parental rights hearing without separate proceedings on the basic issues.

■ After reviewing the basis for the case law as it has been developed over the years, it appears that the grounds for termination of parental rights must rest upon the attitude, conduct, ability, and such other matters relating to the parent's duties, responsibilities, and care for the child which may be, and frequently are, collectively re-

ferred to as "fitness." The relationship of parent and child consisting of a bundle of essential human rights necessary for the preservation of society must be carefully balanced and jealously guarded. There is a vast difference between the granting of "custody" in a divorce action and the "termination of parental rights." The terms "custody" and "best interests of the child" have become terms of art which reflect and convey certain meanings in divorce proceedings. "The best interests of the child" in termination of parental rights, in connection with adoption, takes on another meaning which includes, among other things, the total relationship between child and parent pertaining to and involving heterogeneous values, rights, duties, and concepts.

■ In sequence, the termination question should be resolved first, and the adoption thereafter. But this does not mean two separate proceedings. If followed in such sequence the two issues would remain more identifiable. In parental rights termination matters the "faults," if any, of the parent are considered, which in no way can be considered "faults" of the child who is the innocent party or "victim of circumstances."

■ The indiscriminate deprivation of parental rights without consent or without just cause, would raise serious constitutional impedimenta under the Due Process Clause and would encourage pirating which the law should not permit and society should not allow. We hasten to add that we are not implying that Kottsick is attempting to pirate the children. Any changes from these basic concepts which have been recognized for centuries should be accomplished by legislative action within the constitutional limitations and not by judicial fiat.

In the final analysis, Kottsick, as the husband of the mother, shares the "divorce" custody of the children with her. Many of the benefits he may wish to bestow upon

4. See *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, 558, for citations supporting statements.

the children need not await legal adoption. There are no real legal impedimenta preventing Kottsick from bestowing most, if not all, material benefits he may wish upon the children. However, a name change, which may be of greater subjective value than objective, cannot be accomplished legally without adoption, or judicial proceedings under Chapter 32–28, NDCC. Even where the name is officially changed it does not alter the biological relation between the parent and child. If a mutual relationship compatible with adoption exists, the children upon reaching the age of consent could agree to be adopted.

 After having considered all of the foregoing, we are compelled to conclude that the term "custody," as used in § 14–15–19(3)(c), NDCC, does not have the same meaning as it has in divorce proceedings and a divorce decree. It necessarily has to mean more. We further conclude that a parent whose parental rights have not been previously terminated judicially or by consent is constitutionally entitled to a hearing on his fitness under the Due Process Clause of the United States Constitution.

If any party believes it did not have an opportunity to fully litigate the question of fitness such party may apply for a rehearing on this question. If the application for rehearing is not made within ten days after the remand of this case to the court the judgment of the trial court is affirmed.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VOGEL, JJ., concur.

On Petition for Rehearing

SAND, Judge.

Kottsick, the appellant, petitioned for a rehearing merely for a clarification as to what will be admissible on the rehearing on the matter of fitness.

 Any evidence having probative value to a court of equity as to the present and prospective fitness of the parent is admissible.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VOGEL, JJ., concur.